303 So.2d 570 (1974)
Eddie THIBODEAUX et al.
v.
The LOCK CLINIC et al. (Consolidated with No. 6401, American Southern Insurance Company, et al. v. Harvel Hendricks, et al.).
No. 6400.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1974.
Rehearing Denied December 10, 1974.
*571 Windhorst, Heisler, deLaup & Wysocki, New Orleans (Henry L. Klein, New Orleans), for Eddie Thibodeaux and Alexie J. Para, plaintiffs-appellees.
Vincent A. Marinello, New Orleans, for Adam Para, plaintiff-appellee.
E. G. Schaefer, Jr., New Orelans, for Leon K. Kancher and American Southern Ins. Co., defendants-appellees.
Wiedemann & Fransen, New Orleans (Perrin C. Butler, New Orleans) for Adam Para and Allstate Ins. Co., defendants-appellees.
Rene A. Pastorek and James D. Estopinal, Gretna, for John R. Jumonville and Aetna Cas. and Sur. Co., defendants-appellees.
Porteous, Toledano, Hainkel & Johnson, New Orleans (Ben C. Toledano, New Orleans) for Harvel Hendricks d/b/a The Lock Clinic, James G. Watzon and State *572 Farm Mut. Auto. Ins. Co., defendants-appellants.
Before SAMUEL and LEMMON, JJ., and MARCEL, J. Pro Tem.
LEMMON, Judge.
Four vehicles were involved in the series of collisions which gave rise to these consolidated cases. The issue on appeal is whether the evidence supports the trial judge's conclusion that James Watzon was solely negligent in causing the mishap.
The vehicles involved were:
1. A van or panel truck, driven by Watzon and owned by Harvel Hendricks, d/b/a The Lock Clinic.
2. A station wagon owned and driven by Leon Kancher.
3. A pickup truck owned and driven by Adam Para. Alexie Para and Eddie Thibodeaux were passengers in the pickup truck.
4. A Pontiac sedan owned and driven by John Jumonville.
In Suit No. 6400 the driver and passengers in the pickup truck sued the drivers and insurers of the other three vehicles, and the passengers additionally sued the insurer of the pickup truck.
The accident occurred on an elevated drawbridge across the Intracoastal Canal in Plaquemines Parish. The movable part of the bridge, consisting of steel grating, was estimated to be 100 feet long. This highest portion of the bridge was connected to the ground level highway by a gradually inclined concrete roadway, consisting of two 14-foot wide lanes, which were both used for northbound traffic. The posted speed limit on the bridge was 45 miles per hour.
The accident occurred at dusk, about 6:30 p. m., on a January evening. The testimony conflicted as to the degree of darkness, but the weather was clear and dry.
Watzon's van lost the entire left rear wheel on the bridge, and he brought the van to a stop in the right lane of the descending concrete roadway, about 250 feet from the grating.[1] Watzon testified that an unidentified man stopped in front of his van, retrieved the wheel, jacked up the van, and began to replace the wheel; that while the man was mounting the wheel, he (Watzon) positioned himself in the right lane, two or three car lengths behind the van, and directed traffic from that lane into the left lane with a white handkerchief and a flashlight; that his headlights and taillights were on during this time; that several vehicles passed while the wheel was being mounted; that about 10 minutes or more after the van had been stopped, he saw Kancher's station wagon approaching in the right lane at a fast speed and, after cautioning the man mounting the wheel to move, jumped onto the curb of the bridge; that when the station wagon neared the van, the driver attempted to swerve into the left lane, but collided with Para's pickup truck, which was in that lane; that immediately thereafter the front of the station wagon collided with the rear of his van, while the pickup truck came to rest across the left lane of the roadway, perpendicular to the flow of traffic; and that the Pontiac shortly thereafter struck the right rear side of the pickup truck.
Kancher, the driver of the station wagon, did not testify.
Adam Para, driver of the pickup truck, testified that he and Kancher had stopped at a traffic light one block before the approach to the bridge, he in the left lane and Kancher in the right; that each moved *573 forward in his lane when the light changed; that he was traveling about 40 miles per hour at the grating, with Kancher's station wagon slightly in front of him; that on the downgrade the station wagon suddenly cut into his lane, whereupon the right front of his truck hit the left rear of the station wagon; that almost immediately the station wagon ran into the parked van, and almost immediately thereafter the Pontiac struck him; and that before the collision he neither saw the van nor anyone waving a handkerchief or flashlight.
Alexie Para, a passenger in the pickup truck, substantially verified Adam Para's version, particularly noting that the station wagon was in the right lane, about one-half car length ahead of them, when the station wagon moved into their lane without warning. Eddie Thibodeaux, the other passenger, contradicted Adam Para's testimony on two points, stating that they had entered the left land while on the bridge, on the upgrade side, and that the station wagon struck the van first, forcing the rear end of the station wagon into the left lane where they collided. Neither passenger saw the disabled van prior to the collision, and neither saw anyone with a handkerchief or flashlight.
Jumonville, the driver of the Pontiac, testified that he stopped in the left lane for the traffic light; that he changed to the right lane as he crossed the intersection and passed several cars in the left lane as he climbed the bridge approach; that he switched back to the left lane while on the metal grating; that he was then traveling 40 to 45 miles per hour; that on the downgrade he saw the back end of the pickup lift off the ground and swing into his lane, whereupon he applied his brakes and skidded into the side of the pickup truck; and that he did not see the station wagon or the disabled van prior to the collision.
Three disinterested witnesses, who were traveling together in one vehicle, also testified. The driver stated that they were traveling 40 to 45 miles per hour; that from the crest of the bridge he saw the disabled van half way down, at a point he estimated to be 150 yards away; that he saw the van's taillights burning and a person immediately behind the van waving a white handkerchief; that after he noticed the van, the station wagon passed him on the right; that the station wagon drove directly into the rear of the parked van; that the pickup truck was immediately behind the station wagon and attempted to get into the left lane but struck the station wagon; that he had begun slowing when it was obvious there would be an accident, stopping gradually because of traffic behind him; and that the first two collisions had occurred and he had just about stopped, when the Pontiac passed him on the right and slid into the mass of vehicles.
The other two witnesses testified to substantially the same facts. Although one thought the station wagon had passed them on the upgrade, he stated he could see the disabled van while on the metal grating portion of the bridge.
Watzon's Liability
R.S. 32:141, subd. B requires the driver of a vehicle, which is disabled on the main traveled portion of a highway, to remove it as soon as possible and to protect approaching traffic until it is removed. Whether or not a person has taken reasonably adequate measures to protect traffic is a determination to be made under the facts and circumstances of each case.
The evidence established Watzon made some attempt to warn approaching motorists. Two of the three disinterested witnesses saw taillights burning on the disabled van and saw a man with a handkerchief close behind the van. There was no contradictory evidence, although no witness saw a flashlight as claimed by Watzon.
Nevertheless, we conclude Watzon's actions did not reasonably fulfill his duty to protect traffic under the existing conditions. *574 A motorist coming across the crest of a bridge cannot ascertain immediately whether a vehicle in the lane ahead is moving or stopped, especially at dusk. The driver of a disabled vehicle accordingly has a duty under such conditions to station himself close to the crest of the bridge in order to timely warn traffic that his vehicle is blocking the lane ahead. This positioning (and adequate signaling) is necessary to alert inattentive or momentarily distracted drivers in sufficient time to avoid a collision.
The statutory duty to protect traffic was designed, at least in part, to prevent confused or inattentive drivers from colliding with stationary vehicles on the highway. Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). Watzon's violation of that duty created the exact risk that the statute was designed to prevent. This breach of duty to use reasonable care under the circumstances (as analogized from the conduct required by the statute) renders him liable for the damages caused by his fault. C.C. art. 2315.
Rancher's Liability
Kancher contends that the trial judge's resolution of conflicting testimony should not be disturbed unless manifestly erroneous.
Under any version of the accident accepted, Kancher was negligent. When he reached the crest of the bridge in the right lane, there was nothing to obstruct his view of the stopped van, located almost the length of a football field ahead. Had he been keeping a proper lookout and traveling within the speed limit, he should have seen the van in time to determine that it was stopped and to bring his vehicle to a safe stop. Even under the evidence most favorable to Kancher, he did not apply his brakes or take other evasive action until just before the collision.
The fact that Watzon had effectively set a trap for an inattentive motorist by failing to warn of the hazard in the right lane does not free the inattentive motorist from responsibility for his substandard conduct. Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970).
Kancher's reliance on the sudden emergency doctrine is misplaced. That doctrine has been used by some courts to excuse a motorist's action which, upon sufficient reflection, proves to be a poor choice of alternatives. The doctrine does not excuse improper lookout which contributes to the suddenness of the emergency, nor does the doctrine excuse a person who should have seen an emergency situation in sufficient time to avoid an accident if driving at a safe speed and keeping a reasonable lookout.
We conclude Kancher's negligence was a contributing cause of this accident.
Adam Para's Liability
If we accept Para's version, there was no negligence in his behavior. The left lane, in which he was traveling, was clear, and the station wagon just ahead of him obstructed his view of the hazard in the right lane. He breached no duty to anyone by failing to see the hazard until the station wagon's first indication of danger, which came too late for him to take evasive action.
Para's version was contradicted by other witnesses only in two material particulars, the sequence of the first two collisions and the lane in which he was traveling. Because all witnesses testified that the first two collisions occurred almost simultaneously, we consider it insignificant in evaluating Para's behavior whether the station wagon hit the van first and then was deflected into Para's lane, or whether the station wagon cut into Para's lane and was immediately struck there by Para before being forced into the rear of the station wagon. Under either factual finding, Para's behavior met the standard of that of a reasonable man under like circumstances.
*575 The contradiction of Para's statement that he traveled in the left lane all the way across the bridge is also relatively unimportant, in the absence of any evidence of any negligent behavior on Para's part. No testimony describes negligent action or inaction by Para, regardless of which lane in which he was traveling. An inaccuracy in detail, such as the lane of travel, may be important in weighing evidence. However, even if Para's testimony were judged to be inaccurate or untruthful, the proper result is that his testimony is disregarded. Para cannot be held liable in tort for testifying inaccurately. Liability must be based on direct or circumstantial evidence of Para's fault, and plaintiffs (or, in this case, third party plaintiffs) have the burden of producing this evidence. There was no such evidence.
There was some testimony to suggest excessive speed by Para; other testimony indicates he was traveling within the posted limit. We cannot say the trial judge erred manifestly in resolving the conflict in Para's favor.
Jumonville's Liability
The key issue as to Jumonville's liability is a time-distance determination of how far away he was when the first two collisions completely blocked both lanes of travel and how much time he had to react when presented with this emergency situation.
If we accept Jumonville's testimony, his behavior was reasonable in that he applied his brakes as soon as the pickup truck "lurched" into his lane and he skidded almost to a stop before colliding with the truck. The three disinterested witnesses contradicted this by variously estimating the time interval between the second collision and Jumonville's collision as from 10 to 30 seconds. All other witnesses described the three collisions as very close in time.
The time estimates by the three disinterested witnesses, as well as their distance estimates, were so unlikely that the trial judge could properly have disregarded them. Nevertheless, since there was sufficient credible testimony to support the trial judge's apparent conclusion that Jumonville did not have the time or space to avoid the accident when presented with a sudden emergency not of his own making, we cannot say the conclusion was manifestly erroneous.
Decree
The judgment of the trial court is reversed in part, and it is now ordered that judgment be rendered on the third party demand in favor of James Watzon, Harvel Hendricks d/b/a The Lock Clinic and State Farm Mutual Automobile Insurance Company, and against Leon K. Kancher and American Southern Insurance Company, for one-half of the amount of the judgment on the principal demand. In all other respects, the judgment is affirmed. All costs in both courts are to be equally divided between the two sets of defendants herein cast in judgment.
Affirmed in part, reversed and rendered in part.
NOTES
[1] The investigating officer furnished most of the information as to the physical layout. Although he did not state the length of the downgrade roadway, he established the location of the van as about 250 feet from the grating, and other witnesses reasonably established that point as about halfway between the grating and the ground level.