352 So.2d 717 (1977)
Ethel F. WASHINGTON et al., Plaintiffs-Appellees,
v.
LAKE CITY BEVERAGE, INC., et al., Defendants-Appellants.
No. 6154.
Court of Appeal of Louisiana, Third Circuit.
October 17, 1977.
Rehearing Denied December 14, 1977.
Writ Refused February 10, 1978.
*719 Woodley & Fenet by Robert W. Fenet, Lake Charles, for defendants-appellants.
Wilford D. Carter, Lake Charles, for plaintiffs-appellees.
Before DOMENGEAUX, WATSON and FORET, JJ.
FORET, Judge.
This is a suit for damages for personal injuries brought by Mrs. Ethel F. Washington and her husband, Joseph Washington, for general and special damages. The plaintiffs filed an original and four (4) supplemental and amending petitions wherein Ethel F. Washington sought damages for pain and suffering, mental anguish, distress, etc., and Joseph Washington for property damage, medical expenses, future medical expenses, non-use of the wrecked motor vehicle, mental anguish, storage of the wrecked automobile, loss of his wife's wages, traumatic depreciation to the wrecked auto, and rental of a vehicle.
The plaintiffs filed suit against Lake City Beverage, Inc., Allen Fontenot, and Travelers Insurance Company for damages arising out of an automobile accident which occurred in the early afternoon of January 19, 1976, at the intersection of Enterprise Boulevard and Fourth Street in the City of Lake Charles, Louisiana.
After three (3) days of trial, the jury returned the following verdicts:

VERDICT OF JURY
(1) Was Allen Fontenot negligent, and, if so, was such negligence a proximate cause of the accident?
 ANSWER: √ _____
 (Yes) (No)
(If answered no go no further. If answered yes go to question No. (2).)
(2) Was Ethel F. Washington, contributorily negligent and, if so, was such contributory negligence a proximate cause of the accident?
 ANSWER: _____ √ 
 (Yes) (No)
(If answered yes, go no further. If answered no, go to questions No. (3) and (4).)
(3) What was the amount of damages, if any, that were sustained by Ethel F. Washington as a result of the accident?
 ANSWER: $ $18.900 
(4) What was the amount of damages, if any, that were sustained by Joseph Washington or head and master of the community as a result of this accident?
 ANSWER: $ $7.000 
From those verdicts, defendants appeal, asserting the following as manifest errors:
(1) The trial court erred in refusing to grant a new trial on the ground that plaintiffs' counsel informed the jury during the closing argument of an attempt to compromise undertaken by one of the defendants;
(2) The trial court erred in refusing to grant a new trial on the ground that the jury behaved improperly in awarding damages in excess of those supported by the evidence, and in awarding plaintiff, Joseph Washington, damages for his inconvenience;
(3) The jury erred in awarding damages to plaintiff Joseph Washington for property damages after the trial court sustained defendants' exception of no cause of action or no right of action as regards those particular damages;
(4) The jury erred in awarding damages for automobile rental and the trial judge erred in his charges given to the jury as regards damages for rental of another motor vehicle;
(5) The trial court erred in failing to sustain defendants' exception of no cause of action and no right of action as regards Joseph Washington's claim for the loss of wages of his wife;
(6) The jury erred in awarding excessive special and general damages.

I.

MISCONDUCT OF PLAINTIFFS' COUNSEL
The misconduct of an attorney during trial may constitute grounds for a new *720 trial. That misconduct normally falls into one or more of the following classifications: (1) Actual misstatement of testimony; (2) Statements of fact not supported by the evidence; (3) Statements of matters not in evidence; (4) Intemperate and/or inflammable language; and (5) Improper aspersions on the character of witnesses, opposing counsel and/or the opposing party. Only where the conduct and/or language produces prejudicial effect which is deemed ineradicable despite judicial declarations to disregard same, will the granting of a new trial be justifiable. 66 C.J.S. New Trial §§ 33-37, pp. 122-132.
In this case, during closing argument, plaintiffs' attorney made the following statement:
"Isn't it logical that after he could not reach an agreement with Travelers Insurance to pay it, they offered to pay it for it nowthey offered to pay for it, but" (Tr., pg. 656)
Counsel for defendants immediately objected thereto, and the trial judge instructed the jury as follows:
"Mr. Carter apparently made a slip of the tongue. He mentioned that Travelers Insurance Company had made an offer to repair the vehicle. That is an erroneous statement. That was not in evidence. That was not before you. You are instructed that you are not to consider the statement made by Mr. Carter as to that statement in any way. It is improper. . ."
The issue of negligence, although contested by the defendants, was not a serious issue in dispute. True, the statement of plaintiffs' counsel was impermissible. However, it was not of such a prejudicial character so as not to be eradicated by the instruction of the trial judge.

II.

AFFIDAVIT OF JUROR
The second ground for a new trial and second specification of error submitted by defendants-appellants is based on an affidavit of James Humble, foreman of the jury which rendered the verdicts in this case. (Affidavit is found on page 158 of the transcript.)
In no case in Louisiana has the affidavit of a juror been used to impeach the verdict of a jury. In all of the judicial pronouncements of our courts upon the issue at hand, the use of juror affidavits to impeach a jury verdict has been denied. In the case of Renz v. Texas & Pacific Railway Co., 138 So.2d 114, 123-124 (La.App. 3 Cir. 1962), this Court provided authorities for that rule.
"The trial court correctly held inadmissible the affidavits or testimony of jurors to impeach their own verdict or to show on what grounds it was rendered. Long ago, under similar circumstances, our Supreme Court held: "The testimony was objected to and ruled out, on the ground that a juror cannot be heard as a witness to impeach the verdict of a jury of which he was a member. The ruling was manifestly correct, under repeated decisions of this court. State v. Bird, 38 La.Ann. [497] 499; State v. Chretien, 35 La.Ann. [1031] 1032; State v. Price, 37 La.Ann. [215] 218; State v. Millican, 15 La.Ann. 557; State v. Brette, La.Ann. [652] 653; State v. Caldwell, 3 La.Ann. 435" State v. Morris, 41 La.Ann. 785, 786, 6 So. 639.
See also; Godfrey v. Soniat, 33 La.Ann. 915; Duhon v. Landry, 15 La.Ann. 591; Jeter v. Heard, 12 La.Ann. 3; Cire v. Rightor, 11 La. 140; Campbell v. Miller, 1 Mart (N.S.) 514; Klein v. Medical Building Realty Co., La.App. Orleans, 147 So. 122.
No Louisiana cases contrary thereto are cited by defendant-appellant, and none could be found. It therefore appears that, under the settled jurisprudence, the trial judge was correct in refusing to admit evidence showing that the jurors wished to impeach their verdict.
The holding of the Louisiana courts seems to be in accord with the jurisprudence of other states. In 53 Am.Jur. "Trial" Section 1105 (1945), the general rule, along with the reasons for the rule, are stated:
"While matters of impeachment extrinsic to the verdict may, according to the view of many courts, be shown by the testimony of jurors, it is a long-established and generally accepted doctrine, except where modified by statute, that testimony or affidavits of jurors impeaching a verdict rendered by them will not be received where the facts sought to be shown are such as inhere in the verdict.

*721 "The rule is founded on public policy, and is for the purpose of preventing litigants or the public from invading the privacy of the jury room, either during the deliberations of the jury or afterwards. It is to prevent over-zealous litigants and a curious public from prying into deliberations which are intended to be, and should be, private, frank, and free discussions of the questions under consideration. Further, if after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would open the door for tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under sanction of oath.
"Testimony of the jurors to impeach their own verdict is not excluded because it is irrelevant to the matter in issue, but because experience has shown that it is more likely to prevent them to promote the discovery of the truth. Hence, the affidavit of a juror cannot be admitted to show anything relating to what passed in the jury room during the investigation of the cause, or the effect of a colloquy between the court and a juror, or the arguments made to a juror by a fellow juryman. The rule that a verdict cannot be impeached by the testimony of a juror is generally adhered to where it is sought to impeach a verdict on grounds of misconduct on the part of the juror or his fellow jurors, despite apprehension expressed in many cases that such rule sometimes serves the cause of injustice. In some jurisdictions the rule has been changed by statute allowing affidavits of jurors for the purpose of impeachment of a verdict on the ground of misconduct of the jury. It seems, moreover, to be a recognized limitation in many jurisdictions that if the foundation can be laid by testimony aliunde that the jurors were guilty of such misconduct as to warrant setting aside the verdict, evidence of the jurors in corroboration and in amplification thereof may be heard" pp. 769-771.
This general rule is also stated in substantially the same manner in 89 C.J.S. Trial § 523 (1955).
Conceding the correctness of this general rule, the defendant-appellant nevertheless argues that affidavits and testimony of jurors are admissible to correct clerical errors and to show when through mistake the wording of the verdict filed does not reflect the actual intent of the jurors in reaching their verdict, or when the foreman incorrectly reported that a verdict was reached when in fact it was not. See 53 Am.Jur." Trial", Sections 1110, 1115; 89 C.J.S. Trial § 523. If such exception to the general rule is applicable in Louisiana, we think that nevertheless in the present instance the affidavits and testimony of the jurors, if accepted, would not amount to a correction of an improperly recorded verdict but to the substitution of an entirely different one; as previously stated, under the uniform Louisiana jurisprudence the testimony of the jurors is inadmissible to impeach in such manner their formal verdict."
In Renz, defendant sought to introduce evidence that the jurors did not intend to make an award for the death of the husband because they believed him to be contributorily negligent. See also Dieudonne v. Guidry, 336 So.2d 990 (La.App. 3 Cir. 1976), writ denied, 339 So.2d 853 (La.). (Plaintiff attempted to use the affidavits of certain jurors to impeach the verdict; the foreman of the jury had visited the scene of the accident.); Klein v. Medical Building Realty Co., 147 So. 122 (Orl.Ct. of App. 1933). (Defendant sought to introduce the affidavits of jurors that the large awards made were based on the fact that defendant was insured.)

III.

MOTOR VEHICLE DAMAGE
During trial, after both plaintiffs and defendants had presented their cases, defendants filed an exception of no cause of action and no right of action as regards the claim by plaintiff, Joseph Washington, for damage done to his motor vehicle. At trial, defendants had elicited testimony from plaintiff, Joseph Washington, and Donald Perkins, a claims adjuster for General Adjustment Bureau, that Washington had received collision insurance benefits for his damaged vehicle from his collision insurer, and that Washington had, in addition to receiving checks from his collision insurer, executed an agreement by which Zurich American Insurance Company, the collision insurer was subrogated to the rights of its insured to seek property damage to the wrecked vehicle. This exception of defendants was sustained.
There was evidence that Zurich American Insurance Company, rather than Joseph *722 Washington, was the proper party plaintiff to claim damages for the wrecked motor vehicle. The trial court's ruling sustaining defendants' exception of no right of action was supported by the evidence. We affirm. Canter v. Koehring Co., La., 283 So.2d 716 (1973).

IV.

RENTAL OF ANOTHER MOTOR VEHICLE
At trial, three expert repairmen witnessesJoseph S. Petroski, J. B. Carter, and Ruby Delltestified as to the wrecked condition of plaintiff, Joseph Washington's vehicle. The former two witnesses were of the opinion that within five weeks after the accident, the vehicle was a total loss, and the cost of repair would have exceeded the value of the vehicle. Ruby Dell opined that the auto could have been repaired for a sum less than its market value.
In his charge to the jury, the trial judge made the following comments relative to damages for rental of another vehicle while the wrecked vehicle undergoes restoration:
"You are charged that three tests may be utilized in determining property damages; the first is the cost of restoration, and the second is difference in value of damaged property preceding and subsequent to the injury and the third is cost of replacement.
"You are also charged that the failure of an automobile owner, whose vehicle is damaged by a tort-feasor, to minimize damages by having repairs made promptly is not a complete bar to the recovery of rental price of a substitute vehicle; such failure affects only the amount recoverable; in determining reasonableness of time needed to make the repairs the uncontrollable delay of the repairmen in securing the parts necessary to complete the work should be considered."
Generally, damages for loss of the use of a vehicle (or for the rental of another) are recoverable. However, that rule is subject to the following reservation. In those cases in which the wrecked vehicle is totally destroyed or its repair is not economically feasible, those damages are recoverable only for a reasonable time, that period in which the owner becomes aware of the situation and secures a replacement therefor. Hoffman v. All Star Ins. Corp., 288 So.2d 388 (La.App. 4 Cir. 1974), writ refused, 290 So.2d 909 (La.); Barry v. United States Fidelity & Guaranty Co., 236 So.2d 229 (La.App. 3 Cir. 1970).
We find no error in the charge given to the jury on this point, and we do not know what, if anything, the jury awarded for such damages. We find no manifest error.

V.

LOST WAGES
After all parties had presented their evidence, defendants filed an exception of no cause of action and no right of action as regards the claim of Joseph Washington for the lost wages of his wife; the trial judge ruled thereon, denying such exception, and cited the case of Gebbia v. City of New Orleans, 249 La. 409, 187 So.2d 423 (1966), as authority therefor.
As of the time of the rendition of Gebbia, where dispute existed as to whether the wages of the wife were her separate property or community property, either the husband or wife could sue to enforce the action to collect the lost wages of the wife. C.C.P. Art. 686.
"The husband is the proper plaintiff, during the existence of the marital community, to sue to enforce a right of the community.
"Where doubt exists whether the right sought to be enforced belongs to the marital community or to the separate estate of the wife, the husband and wife may sue in the alternative to enforce the right." *723 However, in 1970, the Louisiana legislature put to rest the issue as to the proper party to collect the lost wages of the wife, by amending Article 686 to read as follows:
"The husband is the proper plaintiff, during the existence of the marital community to sue to enforce a right of the community.
"Where doubt exists whether the right sought to be enforced belongs to the marital community or to the separate estate of the wife, the husband and wife may sue in the alternative to enforce the right.

"The wife, however, is the proper party plaintiff to sue to enforce the right to recover wages, earnings, income, fees, stipends, proceeds and commissions due her as a result of her engaging in or pursuing any occupation, trade or profession involving her individual efforts, services, skills, arts, professional competence, vocational undertaking and personal endeavors, whether or not the same involves investments." (Emphasis added.)
Thus the law applicable to this case is that the wife, rather than the husband, possessed the right to enforce an action to collect her lost wages. Accordingly, the trial judge erred, and we reverse that part of the judgment denying defendants' exception of no right of action on that issue.

VI.

EXCESSIVE DAMAGES
The sixth assignment of error is defendants' assertion that the jury erred in awarding excessive special and general damages.
In this case, no special verdict accompanied by interrogatories, (by which the jury would specify the various items of damages) was presented to the jury. No jury instructions were given to allot damages as between the various items claimed. The jury returned a verdict by which Ethel F. Washington was awarded $18,900.00 and Joseph Washington was awarded $7,000.00. We have no permissible insight into how the jury arrived at these figures (having ruled out the propriety of the affidavit).
In the case of Wade v. McInnis-Peterson Chevrolet, Inc., 307 So.2d 798 (La.App. 1 Cir. 1975), the First Circuit Court of Appeal was also presented with a case in which neither special nor general verdicts accompanied by interrogatories were used by the jury. In this case, as in that case, the appellate court has absolutely no insight into the basis of the jury verdict. Accordingly, we will investigate the record so as to determine whether or not the jury committed manifest error.
In her petition, Ethel F. Washington prayed for judgment in the amount of $450,000.00 for physical pain and suffering, and $125,295.00 for mental anguish and distress. To support those claims, plaintiff relies on her own testimony and that of Drs. Edward C. Campbell and Charles A. Borne.
After the accident, plaintiff, Ethel Washington, was taken to the emergency room of St. Patrick's Hospital in Lake Charles, where she was treated by Dr. Edward C. Campbell, an orthopaedic surgeon. After a short (ten to twenty minutes) examination, Dr. Campbell discharged his patient.
Later that same day, complaining of neck and back pain, Mrs. Washington again sought admittance into St. Patrick's Hospital. There she remained hospitalized until February 2, 1976. During her brief stay, tranquilizers, muscle relaxants, physiotherapy, traction, and exercises were prescribed; x-rays of her right knee, right shoulder, cervical spine, and lumbar spine, all of which displayed negative results, were taken; Mrs. Washington was seen almost daily by Dr. Campbell.
Dr. Campbell thereafter examined Mrs. Washington on six different occasions (February 13, 27, March 18, April 15, May 18, June 17). Dr. Campbell believed that plaintiff *724 could return to part-time employment on March 3, and to full-time employment on April 15. He was of the opinion that Mrs. Washington had suffered a sprain-type injury to her cervical spine and opined:
"I feel that she should recover or have recovered within six months of injury. . . I don't feel that they're [symptoms] disabling or that she has any permanent injury from the accident."
Beginning on March 30, 1976, Dr. Charles A. Borne, a neurosurgeon, examined Mrs. Washington. The results of his physical examinations of his patient were negative, although they revealed tenderness and pain complaints upon palpitation of the cervical regions. At that time, Dr. Borne believed that Mrs. Washington suffered a cervical strain to her neck.
Thereafter, Dr. Borne treated Mrs. Washington on numerous occasions. On May 10 and June 17, the patient had the same complaints, and medication (muscle relaxants) were prescribed therefor. On August 12, an electromyogram was conducted, the results of which were within normal limits. On August 23, September 2, and September 20, the patient still made the same complaints of pain.
On September 26, Mrs. Washington was admitted to Lake Charles Memorial Hospital, where she remained until September 29. While there, Mrs. Washington underwent an electroencephalogram (brain wave test), an echoencephalogram, brain scan, cerebral blood flow study, myelogram of the lumbar, dorsal, and cervical regions, bone scan, and a cardiogram, the results of all of which were normal.
In the latter part of October and the early part of November (Nov. 2), 1976, bruises to Mrs. Washington's body and lumps in her axilla became apparent. On December 1, a biopsy of Mrs. Washington's axillary masses was conducted. After Dr. Borne reviewed the results of that test, he concluded that neither the bruises nor the lumps were a result of the auto accident, and he opined:
"At this point I think we have done all that is possible, as far as establishing a diagnosis in this patient's case of anything more than a cervical strain."
He was further of the belief that a reasonable period of recovery was three (3) to eighteen (18) months after the injury.
On August 22, 1976, Dr. James Ambrister, an orthopaedic surgeon, examined Mrs. Washington. From his physical examination of the patient and from his review of the tests previously conducted upon his patient, Dr. Ambrister opined:
"The patient was seen approximately one year following an automobile accident with multiple areas of pain. The examination of these regions revealed no findings which would explain a basis for her symptoms. That is to be on the basis of trauma. The x-ray examinations of the painful regions were normal."
He concluded that the patient's complaints were not clinically significant and were not disabling.
Although there is evidence that plaintiff, Ethel Washington, suffered a strain to her cervical spine, we believe that the damages awarded to her are excessive. However, we have only the record before us. The trial judge and the jury were in a better position to witness the demeanor of those who testified before them. The award was within the perimeters of that which could have been granted. Therefore, we can but affirm the award to plaintiff, Ethel F. Washington. Coco v. Winston Industries, Inc., La., 341 So.2d 332 (1976).
Plaintiff, Joseph Washington, prayed for judgment in the amounts of $2,800.00 in property damage; $1,755.00 in medical expenses; $20,000.00 for future medical expenses; $2,000.00 for his non-use of his *725 wrecked motor vehicle; $17,800.00 for mental anguish and distress; $400.00 for auto storage; $1,180.00 for loss of his wife's wages; $1,500.00 for traumatic depreciation to his auto, and $700.00 for rental of another motor vehicle.
At trial, there was an evidentiary basis for the award to plaintiff Joseph Washington. It was stipulated as between counsel that the medical bills for the treatment of Ethel Washington totalled $4,649.15. (That item of damages is part of the community, for which Joseph Washington, as head and master thereof, can sue. LSA-C.C. Art. 2334). There was a possibility of future medical expenses. Plaintiff was entitled to an award for rental of another motor vehicle and for damages to his automobile (the deductible amount of the collision auto insurance policy). The jury award of $7,000.00 was not an abuse of the much discretion rule. Coco v. Winston Industries, Inc., supra.
For the foregoing reasons, we affirm the judgment of the trial court on all issues save and except the portion thereof which denies defendants' exception of no right of action as to the husband's right to sue for recovery of the wife's wages.
All costs of this appeal are assessed against the defendants.
AFFIRMED IN PART and REVERSED IN PART.
WATSON, J., concurs in the result.