414 So.2d 1263 (1982)
BUNKIE FUNERAL HOME, INC., Plaintiffs & Appellees, et al.,
v.
Julian McNUTT, et al., Defendants & Appellants.
No. 8668.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1982.
*1265 Brittain & Williams, Jack O. Brittain, Natchitoches, for defendants-appellants-appellees.
Gold, Little, Simon, Weems & Bruser, Larry Feldman, Jr., Alexandria, for defendants-appellees-appellants.
Gist, Methvin, Hughes & Munsterman, DeWitt T. Methvin, Jr., Stafford, Stewart & Potter, Walter May, Voltz & Ware, Gus A. Voltz, Alexandria, for defendants-appellees.
Chris J. Roy, Alexandria, for plaintiffs-appellees.
Before CULPEPPER, GUIDRY and STOKER, JJ.
CULPEPPER, Judge.
This case was consolidated for trial, and for appeal, with Charles A. Roberts, Sr., et al. v. Jeff D. Keys, et al., 414 So.2d 1273, in which a separate judgment is being rendered by us this date. Both cases are for damages arising from accidents in which an automobile first struck and killed a black calf and then an ambulance struck the dead calf lying on the highway. The present case is by Bunkie Funeral Home, Inc. and Jeff D. Keys, respectively the owner and the driver of the ambulance, for property damage to the ambulance and for personal injuries sustained by the driver. The companion case by Mr. and Mrs. Charles A. Roberts, Sr., and Charles A. Roberts, Jr., is for personal injuries suffered by Mrs. Roberts and Charles, Jr. as occupants of the ambulance. Suit was filed against numerous defendants in the present case by Bunkie Funeral Home and Jeff Keys. These include Horace C. Pringle, driver of the first car which hit the calf, and his liability insurer, State Farm Mutual Auto Insurance, Charles Davis, one of the defendants alleged to be the owner of the calf, and Julian McNutt, the defendant found by the trial court to be the owner of the calf, and his liability insurer, Southern Farm Bureau Casualty Insurance Company. In the suit brought by Mr. and Mrs. Roberts and their son, the defendants include Horace C. Pringle and his insurer, Julian McNutt and his insurer, Jeff D. Keys, Bunkie Funeral Home, Inc., Mrs. Alena J. Thurman, president of the funeral home, and the liability insurer of both the ambulance and Mrs. Thurman, Aetna Casualty & Surety Company.
The trial judge found that defendant, Julian McNutt, was owner of the black calf and was negligent in allowing it to get on the highway, which negligence was the sole cause of the accident and injuries. He further found that Horace C. Pringle and Jeff D. Keys were not guilty of any negligence in the accident. The trial court awarded general damages for personal injuries to Charles Roberts, Jr. in the amount of $5,000, and to Barbara Roberts in the amount of $140,000, but denied the personal injury claim made by Jeff Keys. He also awarded property damages to Bunkie Funeral Home in the amount of $21,183.89 for destruction of its ambulance. From this judgment, Jeff D. Keys, in his posture as plaintiff in the present case, and defendants, Julian McNutt and Southern Farm Bureau, have appealed.
The following issues have been raised and briefed by the parties: (1) Whether the evidence was sufficient to prove defendant McNutt was owner of the calf; (2) whether Horace Pringle was guilty of negligence or non-negligent fault; (3) whether Jeff Keys was guilty of negligence or non-negligent fault; (4) if Jeff Keys was guilty of fault, whether Mrs. Alena Thurman may be held personally liable by piercing the corporate veil of Bunkie Funeral Home; (5) whether the $140,000 for general damages awarded to Barbara Roberts is excessive; (6) whether the award to Bunkie Funeral Home for property damage is excessive; (7) whether the award to Bunkie Funeral Home is inadequate; *1266 (8) whether Jeff Keys is entitled to an award for general damages?

FACTS
This case arises out of two separate accidents which occurred on U. S. Highway 71 just north of Lecompte, Louisiana. Highway 71 is a stock law highway, upon which livestock are prohibited to go at large, LSA-R.S. 3:2803. At the point at which these accidents occurred, the highway is a divided, four-lane highway, and had been resurfaced just prior to the accident, leaving it a dark black color. The accidents occurred at night and the highway was unilluminated, except for the headlights of traffic. According to the testimony of both drivers, it had rained earlier in the day, but the road was not wet, nor was there standing water in the roadway.
At approximately 8:30 p. m. on July 10, 1977, Horace C. Pringle was proceeding north on Highway 71 in the right-hand lane at a speed of 50-55 miles per hour. He noticed, standing off the roadway to his right, a small, yellow, white-faced calf, which momentarily diverted his attention from the road in front of him. A short distance later, he hit a dark object located approximately at the center line of the two north bound lanes of the highway, apparently striking it with the left front fender of his automobile. He brought the car to a stop on the east shoulder of the road and backed his vehicle to a point a short distance south of the object he had struck, which he then discovered was a solid black calf, lying across the center line with its head pointed in an easterly direction. After turning on his emergency flashers, Mr. Pringle began making calls on his CB radio in an attempt to contact the State Police. After being informed via the radio that he should try the emergency channel 9, he changed channels and began to continue his calls. At this point, he glanced in his rear view mirror and noticed a set of flashing lights apparently heading north on the highway. Seconds later, the ambulance owned by Bunkie Funeral Home and driven by Jeff D. Keys, collided with the black calf as it lay in the middle of the roadway.
Earlier that same evening, Mr. Keys had received a call that emergency transportation was required for a patient at Bunkie General Hospital, who was to be transferred to Cabrini Hospital in Alexandria. He had proceeded to the hospital and picked up Charles Roberts, Jr., the victim of a shotgun accident, who had suffered an injury to his left hand. Charles, Jr. (Chuck) was accompanied by his mother, Barbara Roberts, who was a registered nurse. Mr. Keys had his flashing emergency lights on, with his headlights on low beam, and was proceeding north at approximately 65-70 miles per hour. At the time of the accident, the ambulance was in the left-hand lane of travel, having passed slower traffic in the right-hand lane several moments before the impact. Mr. Keys testified that he saw the animal just as he hit it but could not tell what it was at the time. After the impact, the ambulance skidded out of control, with the calf locked under the wheel, and hit the shoulder of the road. At this point, the calf was dislodged from the undercarriage, and the ambulance skidded into a ditch and flipped over against an embankment. As a result of this accident, all three occupants of the ambulance sustained personal injuries, and the ambulance itself was a total loss.

OWNERSHIP OF THE CALF
Several cattle owners in the area were sued as alleged owners of the calf which was killed in the accident. However, by the close of the evidence, all had been granted either summary judgments or judgments of dismissal, with the exception of defendants Charles Davis and Julian McNutt. The trial judge ruled in favor of the defendant Charles Davis, and against defendant McNutt, finding that the plaintiff had shown by a preponderance of the evidence that the calf belonged to McNutt, and that he was negligent in allowing it to go at large upon the highway. Defendant McNutt contends first that the trial court erred in placing the burden of proof on him to show that he was not owner of the calf, rather than on the plaintiffs to show that he was, and second, that the evidence was *1267 sufficient to show that Mr. McNutt did not own the calf. All plaintiffs contend that the evidence in the record supports the trial court's finding of McNutt's ownership.
None of the witnesses who viewed the dead calf could testify as to any distinctive markings of ownership on the carcass. It was not branded. There was no evidence of any openings or holes in any of the fences in the surrounding area through which the black calf and its apparent companion could have found their way to the highway. Therefore, the plaintiffs' case regarding ownership of the dead calf consisted entirely of circumstantial evidence.
The defendants rely on Motors Insurance Corporation v. Melder, 336 So.2d 954 (La. App. 3rd Cir. 1976), in which this court recognized the following standard against which the sufficiency of circumstantial evidence must be judged:
"`Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes.' Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905, 913 (La. 1973); Naquin v. Marquette Casualty Co., La. 569, 153 So.2d 395, 397 (1963)."
It was further noted that this test allows the trier of fact to weigh other reasonable hypotheses against the one offered by the plaintiffs to determine whether the evidence as a whole constitutes a preponderance.
Mr. McNutt was the owner of the property fronting the highway at the point at which the accident occurred. His fences were well constructed and, as stated above, no holes were found in them. Access to Mr. McNutt's property could only be gained through his front gate, located just off Highway 71 and normally kept chained and padlocked. However, it was shown that, on the Friday and Saturday preceding the accident, the gate had been left open for a considerable length of time in order to provide admittance to vehicles of persons participating in a quarter horse show which was held on McNutt's property. Mr. McNutt testified that, because of the show, he had transferred all of his cattle from the other pastures on his property to a pasture located behind his house, which was well away from the road. However, photographs taken the night of the accident were introduced at trial showing the presence of cattle in the pasture which fronts on the highway. There was no explanation as to how or when the cattle came to be in this pasture.
Charles Davis owns the property fronting on the highway to the north of McNutt's property. He testified that the only black Angus calves he owned at the time had white faces, and that they would have had to cross from two to four fences or get through three gates to get to the highway. At the time of the accident, he had 15 calves and none were missing when he made his customary count the morning after the accident, nor at any later date.
The owner of the land across the highway from McNutt was Warren Haggert. He testified that his cattle were in the pasture by his house, some 2½ miles from McNutt's fence, at the time of the accident. His property is separated from McNutt's by both lanes of the highway and the Rock Island railroad right of way, which has a double fence. He has a registered brand, but does not brand the calves he keeps at his house. He also testified that most of the calves he owned at the time were black with white faces, along with a few red ones with white faces.
The dead calf was solid black. The calf on the side of the road was a yellow white-faced calf. Defendant McNutt testified that he knew the calf on the side of the road was not his because he had only a few white-faced calves at that time. Therefore, presumably the rest were solid in color like the dead calf. McNutt was the only cattle owner to actually view the dead calf, and the only person to testify that it had been recently castrated. However, both he and Davis testified they did not castrate their calves. Defendant Haggert testified that he only castrated his animals in the late fall.
*1268 According to the McNutts' records, of their calves bought, sold or lost, they should have had 64 calves, and yet their count on the Monday after the accident revealed they had only 62. They had on their property an impounding pen, used by the State Police for impounding cattle found at large upon the highway. The yellow calf was placed there by defendant McNutt, but had mysteriously disappeared the next day, despite the claimed impregnability of all McNutt's fences and gates.
The fact that the accident occurred adjacent to Mr. McNutt's property, that he was the only cattleman in the area with solid black calves, and that the discrepancy between his records and the count of his calves on the day after the accident, all point to Mr. McNutt's ownership of the calves. In addition to this, it is undisputed that his animals were in the pasture next to the road, and that this front gate was open on the preceding Friday, Saturday and part of the day Sunday. These facts, in the aggregate, lead us to conclude the trial judge was not clearly wrong in his finding the evidence presented excludes, with a fair amount of certainty, every reasonable hypothesis but that the dead calf was owned by defendant McNutt.

PRINGLE'S NEGLIGENCE
All plaintiffs, as well as defendant McNutt, contend on this appeal that the trial court erred in finding that defendant Pringle was free of actionable negligence. They argue that he breached a duty to either remove the dead calf from the traveled portion of the road, or to provide some warning of the obstruction to the traffic on the highway.
A motorist has a duty not to cause an obstruction to the normal flow of traffic on a highway or to adequately warn approaching motorists of any obstructions he does cause. State Farm Mutual Automobile Insurance Company v. So. Cen. Bell Tel. Company, 359 So.2d 1318 (La.App. 4th Cir. 1978). This duty is designed to prevent the risk of confused or inattentive drivers colliding with such obstructions. State Farm Auto Insurance Company v. So. Cen. Bell, supra; Thibodeaux v. Lock Clinic, 303 So.2d 570 (La.App. 4th Cir. 1974). However, whether or not a motorist has complied with this duty is a question of fact depending on the circumstances of each case. Thibodeaux v. Lock Clinic, supra.
The cases relied on by the plaintiffs and defendant-appellant McNutt, wherein motorists were held liable for negligence in failing to adequately warn approaching motorists of obstructions in the highway, involved obstructions by a vehicle or a boat which had been under the custody and control of the defendant immediately preceding the subsequent collision. See State Farm Mutual Automobile Insurance Company, supra; Thibodeaux, supra; Adams v. Allstate Insurance Company, 212 So.2d 204 (La.App. 4th Cir. 1968). Furthermore, in each of these cases, it was shown the defendants involved had ample means, as well as ample time, in which to effectively warn oncoming traffic of the obstruction.
In the instant case, the trial judge decided that the second accident occurred so soon after Pringle hit the calf that he did not have time to prevent the ambulance from hitting the dead calf. The lapse of time between the first collision and the second was estimated by both Mr. and Mrs. Pringle as being only a very short time, Mrs. Pringle estimating that it was no more than a minute or so. Mr. Pringle testified that he only had time to make one CB call, change channels, and make maybe two calls on the emergency channel. No evidence was introduced to rebut this testimony, nor was there any evidence that Mr. Pringle had the means with which to effectively warn approaching traffic other than his emergency flashers. For these reasons, we do not find the trial judge was clearly wrong in holding Pringle free of negligence.
Plaintiffs Roberts contend that even if defendant Pringle was not guilty of negligence, he should be held liable for non-negligent fault under Seals v. Morris, 410 So.2d 715 (La.1981). In that case, a collision occurred between plaintiff and defendant when defendant noticed a green snake on his shoulder, lost control of his truck and *1269 proceeded past a stop sign into an intersection. The Supreme Court held that although the defendant was not negligent he was at fault, and that for defendant to escape responsibility he would have to prove that the damages to the fault-free plaintiff were caused by the fault of a third person or by some external circumstance sufficient to discharge the defendant from responsibility. The Seals case has no application here because Pringle was neither negligent nor at fault. This case is controlled by the established jurisprudential rule that a motorist traveling at night is not charged with the duty of guarding against striking an unexpected or unusual obstruction, which he had no reason to anticipate he would encounter on the highway. Kirk v. United Gas Public Service Company, 185 La. 580, 170 So. 1 (1936).

KEYS' NEGLIGENCE
It is also contended by the plaintiffs Roberts and defendant McNutt that the driver of the ambulance was guilty of negligence in exceeding the speed limit, failing to see and heed the emergency flashers on the Pringle vehicle, and failing to see the calf in the headlights of the Pringle vehicle. These contentions are without merit.
In the first place, it is clear that the failure to see and heed the emergency flashers on the Pringle vehicle was not a cause in fact of the accident, inasmuch as the ambulance was already in the left lane of travel. The natural response of a motorist on a four-lane highway, upon seeing such an emergency signal, would be to move to the left-hand lane of the highway. Since Mr. Keys was already in the left-hand lane of travel, his failure to see the emergency signal of the Pringle vehicle was not a cause in fact of the subsequent accident.
We further find no clear error in the trial judge's holding that the failure to see the calf in the headlights of the Pringle vehicle did not constitute negligence. As stated earlier, a motorist driving on a high speed highway at night is not as a matter of law required to see an unlighted and unexpected object in his path in time to come to a safe stop. Bordelon v. State, through Department of Highways, 253 So.2d 677 (La.App. 1st Cir. 1971), writ refused 260 La. 18, 254 So.2d 619 (1971). This highway is unilluminated at the point at which the accident occurred. The evidence indicates that the calf was lying across the center line of the highway, with the greater part of the bulk probably in the left lane. The Pringle vehicle was parked only a short distance south of the calf on the shoulder of the road, with the headlights on dim and pointing directly up the shoulder of the road. Therefore, it is unlikely that the Pringle headlights cast much, if any, illumination on the bulk of the calf as it lay on the dark surface of the roadway. Under these circumstances, we concur in the trial court's finding that Keys was free of fault in failing to detect the presence of the calf.
We further reject the contention that the excessive speed of 65-70 miles per hour constituted negligence. The argument is that inasmuch as the patient's condition evidenced no cause for alarm on the way from one hospital to another, the driver was not on an emergency mission, and therefore not authorized to exceed the speed limit. As stated by this court in Cassity v. Williams, 373 So.2d 586 (La.App. 3rd Cir. 1979):
"Although the driver of an emergency vehicle is authorized by LSA-R.S. 32:24 to exceed speed limits and to disregard regulations governing direction of traffic flow, the statute also expressly provides that such driver is not relieved of the duty to drive with due regard for the safety of others. Carpenter v. Hartford Accident and Indemnity Co., 333 So.2d 296 (La.App. 1 Cir. 1976)."
Two factors to be considered in determining whether a particular act of a driver of an emergency vehicle is excusable are (1) the inherent danger of the act of the driver and (2) whether the dangerous act is necessary to the performance of the emergency function. See Hryhorchuk v. Smith, 379 So.2d 281 (La.App. 3rd Cir. 1979), modified on other grounds 390 So.2d 497 (La. 1980). The inherent danger of proceeding at this speed on a divided four-lane, stock law highway, where a night motorist may assume the roadway will be clear of unexpected *1270 obstructions, is not, in and of itself, great enough to render the driver negligent. Furthermore, although the patient's immediate condition was not cause for alarm, it is also apparent that all due speed was advisable in transporting this young patient for further treatment, as long as the driver continued to exercise due regard for the safety of others. We conclude the trial court's finding was not clearly wrong.
We also reject plaintiff Robert's contention that Keys was guilty of non-negligent fault for the same reasons stated in connection with our finding that Pringle was not guilty of non-negligent fault.
Inasmuch as we find no liability on the part of Keys, which could be imputed to Bunkie Funeral Home as his employer, there is no need for a finding as to the nature of the corporate existence and function of Bunkie Funeral Home, Inc.

BUNKIE FUNERAL HOME, INC.
Defendant-appellant McNutt urges that the award made by the trial court to Bunkie Funeral Home for the loss of its ambulance was excessive, inasmuch as the amount awarded was the same sum as the corporation paid for the ambulance in 1976. As stated above, the inquiry is whether or not the trial court abused its discretion. Ordinarily, if a vehicle is a total loss, the plaintiff-owner would be entitled to the market value of the vehicle before the accident, less its salvage value, if any. However, there is no mechanical rule which may be applied in the assessment of property damage, and each case rests on its own facts and circumstances as supported by the proof in the record. See Coleman v. Victor, 326 So.2d 344 (La.1976); Kalmn, Inc. v. Empire Gas Corporation, 406 So.2d 276 (La. App. 3rd Cir. 1981).
The defendant argues that the award should have been the fair market value before the accident, less salvage value. Inasmuch as no evidence was introduced into the record to show what these values were, the trial court was effectively precluded from making an award on this basis. The only figures introduced which were pertinent to the value of the damages sustained by Bunkie Funeral Home were the respective prices of the destroyed ambulance and the replacement ambulance. We therefore find the trial court's award of $21,183.89 for destruction of the ambulance was not excessive, since this was the lowest figure introduced into evidence.
Bunkie Funeral Home argues that the trial court erred in rejecting its claim for damages for loss of use of its vehicle for the three months it took to procure a replacement. The general rule is that where a wrecked vehicle is totally destroyed or repair is not economically feasible, damages for the loss of use of the vehicle are recoverable, but only for a reasonable period of time, i.e., that period in which the owner should become aware of the situation and secure a replacement. Hoffman v. All Star Insurance Corporation, 288 So.2d 388 (La.App. 4th Cir. 1974), writ refused 290 So.2d 909 (1974); Washington v. Lake City Beverage, 352 So.2d 717 (La. App. 3rd Cir. 1977), writ refused 354 So.2d 1050 (La.1978). Since there was no evidence introduced to show what would have been a reasonable period of time in which to secure and put into operation a replacement for the destroyed ambulance, we find no abuse of the trial court's discretion in rejecting this item of damages.

JEFF D. KEYS' DAMAGES
The trial court found Jeff Keys proved no damages. We conclude that this holding by the trial judge was manifestly erroneous.
We recognize that we must give great weight to the finding of fact by the trial judge. Canter v. Koehring Company, 283 So.2d 716 (La.1973). However, plaintiffs with clearly objective symptoms of injury should not be refused general damages. See Robinson v. General Motors Corporation, 328 So.2d 751 (La.App. 4th Cir. 1976); Mora v. American Motors Leasing Corporation, 364 So.2d 1343 (La.App. 4th Cir. 1978). A review of the evidence convinces us that the trial judge was clearly wrong in denying damages for Mr. Keys' personal injuries. See also Moss v. Security National Insurance Company, 350 So.2d 247 *1271 (La.App. 3rd Cir. 1977), writ refused 352 So.2d 239 (La.1977).
Mr. Keys himself testified as to his injuries, hospitalization, and treatment by Dr. John Lemoine, his family physician. The deposition of Dr. Lemoine was introduced into evidence, and shows that Keys suffered a moderate cervical strain causing pain in his neck, and non-displaced fracture of the acronium, which is the bony process coming off the scapula and uniting with the collar bone. Dr. Lemoine testified that these were significant injuries, and that at the time of treatment, Keys was in severe pain consistent with the type of injuries suffered. The plaintiff was hospitalized for five days, and discharged before his injuries were healed. It was estimated that such injuries would take approximately eight to ten weeks to heal completely.
It was stipulated by the parties at trial that Aetna, who joined with Mr. Keys and Bunkie Funeral Home as plaintiffs in the original petition in its capacity as the workmen's compensation insurer, had paid a total of $1,017.66 in workmen's benefits and medical expenses to and on behalf of Mr. Keys.
We therefore shall award, under the principles of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), the lowest amount which could reasonably have been awarded for the damages to Mr. Keys by the trier of fact. We find the lowest amount which could reasonably have been awarded to Mr. Keys for his general damages to be $5,000 for pain and suffering, and mental anguish. Since Aetna has not appealed its subrogation claim, we cannot amend the judgment in its favor.

AWARD TO BARBARA ROBERTS
Defendant-appellant contends the award of $140,000 to Barbara Roberts for general damages is so excessive as to constitute an abuse of discretion by the trial judge. Mrs. Roberts' counsel concedes the award is on the high side, but argues it is not an abuse of discretion.
The evidence shows that immediately after the accident Mrs. Roberts was taken to a hospital in Alexandria where she was seen by Dr. Douglas L. Gamburg, a specialist in orthopedic surgery, who became the treating physician. His diagnosis was fracture of the right scapula (shoulder blade), fracture of the right clavicle (collar bone) and a small avulsion fracture of the fourth lumbar vertebra. She was hospitalized and her right arm placed in side arm traction to reduce pain and allow healing of the fractured collar bone. The fracture to the shoulder bone required no specific attention, as it heals itself. The avulsion fracture of the spine required no treatment except bed rest. She remained in the hospital until August 1, 1977, when she was discharged with her right arm in a sling.
Thereafter she continued to see Dr. Gamburg, who testified as follows that her shoulder and collar bone injuries healed normally:
"Q. Dr. Gamburg, what's the normal healing time for a shoulder fracture of the clavicle and scapula such as she had in a lady of her age?
A. About three months.
Q. Was her healing time within the framework that you would consider normal?
A. I think it was, yes.
Q. Once the fractures are healed, is there any real reason for there to be further complaints of pain?
A. Well, there could be many reasons for continuing complaints. Ordinarily they fade with time. The soft tisuses around the clavicle and the scapula can be injured at the time of the accident or injury and they may have lingering symptoms for up to three to six months. But unless there's been some joint disruption or some change in configuration of a joint relationship as a result of the fracture the pain generally subsides and leaves the patient with minimal impairment.
Q. There was no joint impairment in connection with her fractures, were there?
A. I never was able to find any problem.

*1272 Q. Now, the weakness which she had following it, it was due toprimarily to the bruises to the tissues and to her not using the arm for that period of time, is that correct?
A. Right. There is a weakness that would be expected following immobilization and injury. However, her weakness in October of 78 could not be explained strictly on the basis of the initial injury and its immediate aftermath.
Q. In a normal situation, with the use of the extremity after the fractures have healed the strength comes back, does it not?
A. That's correct."
With regard to the avulsion fracture of L-4, Dr. Gamburg testified:
"Q. Now, talking about the avulsion fracture of L-4, in the beginning you indicated a slight crushcrushing of the L-4 and then later on in your testimony you referred to it as an avulsion fracture. Can you clarify it for me a little bit? Do we have a compression type of a fracture or do we just have a piece of the bone tearing off with the ligament?
A. It is an avulsion fracture rather than a compression fracture. It's a piece of bone that tore off with the ligamentwith the anterior longitudinal ligament.
Q. Then there really wasn't any crushing of the vertebra itself?
A. That's correct.
Q. All right. And you said that the slight avulsion which she had was not really significant from a neurological standpoint? Is thatdid I understand you correctly?
A. Yes. That's correct."
About six weeks after the accident, Mrs. Roberts was seen by Dr. Babson Fresh, a neurosurgeon in Alexandria, who found no nerve root pressure resulting from the vertebra injury nor any other neurological abnormality resulting from her injuries.
Mrs. Roberts was also seen by Dr. Davidson H. Texada, a psychiatrist, whose report dated August 28, 1978 states that he found no emotional condition resulting from the accident.
At the trial, plaintiff testified she was then 49 years of age and was a registered nurse. However, her last employment was about a year before the accident. She was director of nurses at a nursing home in Simmesport. She testified that before the accident she had no physical infirmities, and that she could work, go fishing with her husband, dance, and generally do anything she wanted. However, she says that since the accident she still has pain in her back, that she limps, that she has pain in her arm and has trouble using her hands, that her kidney function has been affected so that she has difficulty voiding, and that she does not feel like going places and doing things as she did before the accident.
Apparently the trial judge was impressed by the testimony of Mrs. Roberts that she has residuals from the accident. However, there is absolutely no expert medical testimony to support the existence of these residuals. The three doctors listed above, including Dr. Gamburg, who was the treating physician, could find no justification for her continued complaints. They all expressed the opinion she had no residuals.
Under the evidence, we conclude the award of $140,000 in general damages was an abuse of the trial court's discretion. We find the highest award which can be justified under the evidence is $80,000. We will reduce the award accordingly.

THE DECREE
For the reasons assigned, the judgment appealed is amended to award to Jeff D. Keys for general damages the sum of $5,000, together with legal interest thereon from date of judicial demand until paid. In all other respects, the judgment appealed is affirmed at the cost of defendants-appellants, Julian McNutt and Southern Farm Bureau Casualty Insurance Company.
AFFIRMED, AS AMENDED.