476 So.2d 837 (1985)
Thomasa Lynn FINLEY, Plaintiff-Appellant,
v.
NORTH ASSURANCE COMPANY OF AMERICA and Philip S. Surria, III, Defendants-Appellees.
Flora MINCHEW, Plaintiff-Appellant,
v.
NORTH ASSURANCE COMPANY OF AMERICA and Philip S. Scurria, III, Defendants-Appellees.
Nos. 17001, 17002-CA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1985.
*838 Dimos, Brown, Erskine, Burkett and Smith by Jimmy N. Dimos and Wade R. Baggette, Monroe, for plaintiffs-appellants.
Theus, Grisham, Davis, Leigh & Brown by Brian E. Crawford, Monroe, for defendants-appellees.
Before HALL, C.J., and MARVIN, JASPER E. JONES, SEXTON and NORRIS, JJ.
MARVIN, Judge.
In consolidated actions arising out of a nighttime auto-pedestrian accident, the surviving pedestrian, Tammie Finley, and the heirs of the fatally injured pedestrian, Frank Minchew, appeal a judgment rejecting *839 their respective demands for damages. CC Art. 2315.
The factual circumstances are not disputed. We respectfully disagree with the trial court's ultimate legal conclusion that the "scope of [the motorist's] duty did not extend to protecting these victims, who apparently [incapacitated because of substance and alcohol abuse] ... stood motionless and embrac[ed] in the northbound lane of U.S. Hwy. 65 ... in violation of LRS 32:213, 214, and 216."[1] Concluding to the contrary, we find the motorist comparatively negligent and reverse and render judgment in each case and award damages to plaintiffs. CC Art. 2323.

FACTS
The accident occurred about 1:30 a.m. April 1, 1982, in the northbound lane of U.S. Highway 65 about one-quarter mile south of its intersection with I-20. This intersection is immediately south of the town of Tallulah. U.S. 65 is a two-lane north-south highway with a paved travel surface and paved shoulders. The traveled surface is 24 feet wide marked by a center line and by white lines separating each lane from its 10-foot paved shoulder.
The highway is straight and essentially level near the accident scene. At the southwest corner of the intersection is a truck stop and restaurant. A farm implement business is about one mile south of the truck stop. Immediately north of the farm implement business is a low spot surrounding a canal. This low spot created or held intermittent patches of fog on the highway which, to varying degree, affected visibility of traffic. Otherwise, visibility and the highway were unaffected by weather conditions. No other traffic was directly involved beside the defendant's automobile.

THE PEDESTRIANS
Tammie Finley and Frank Minchew were engaged to be married. They drank beer with a friend, Mike Lord, during the day and continued to do so on the night of the accident. Frank and Mike also smoked marijuana that day. They had visited various bars around Tallulah and stopped at the truck stop before 1:30 a.m..
Frank went into the truck stop to eat. Mike remained in the car with Tammie who was asleep. When Frank returned, Tammie awakened and the two argued whether Frank should drive the car. Frank's driving privileges had been revoked because of a DWI conviction. The argument continued and Tammie departed, walking south along the western shoulder of the highway.
Frank allowed Tammie to walk some distance, drove past her to the farm implement business, where he turned the car around and drove north toward Tammie. The car experienced a blow-out or flat tire and Frank parked it 660 feet south of the truck stop on the 10-foot shoulder of the northbound lane. Tammie saw Frank get out of the car while she was walking toward the car. She crossed to the eastbound shoulder and continued walking toward the car.
Frank saw Tammie and walked to meet her on the highway. Mike then decided to walk to the truck stop (about 660 feet north) to purchase cigarettes. Frank and Tammie met each other north of the parked car and began to resolve their lover's quarrel. Mike walked past them toward the truck stop.
*840 Returning from the truck stop, Mike could see Frank and Tammie standing embraced near the east edge of the northbound traffic lane. Tammie wore blue jeans and a cream colored blouse. Frank wore blue jeans and a red and blue shirt. When Mike was 150 feet away from them he saw defendant's northbound vehicle approaching them and realized that tragedy was imminent because they stood motionless and oblivious to the danger. Temporarily "shocked" by what he saw, Mike was rendered speechless and could not warn them.
The right front corner of defendant's auto struck the couple. Measurements later made by investigating officers from debris and a wet spot in the road, the assumed point of impact, showed that Frank and Tammie were standing about 4 to 5 feet west of the white line separating the northbound lane from its paved shoulder and 435 feet south of the truck stop. Tammie was found 74 feet north of the wet spot and debris. Frank's body was found 108 feet north.
Tammie testified she saw the blinding lights of the car about the time it hit them but otherwise she did not see the car or hear the skidding tires. Defendant did not blow his horn. Frank was killed by the impact. His blood contained .28 grams percent alcohol.
Skid marks through impact measured 27 feet. Impact occurred near the northmost point of the skid marks which were entirely within the northbound lane and veered toward but not across the center line. Defendant took his foot off his brakes after impact and stopped at the truck stop 435 feet north, where he and his wife reported the accident and asked that an ambulance be called.
Defendant, with his wife as his passenger, had driven south from Tallulah on another road, taking a "midnight" drive after baby sitting. Heading north, he had turned onto Hwy. 65 four miles south of the truck stop. Defendant encountered the first patch of fog as he passed the farm implement business about a mile away from the truck stop. Defendant said he drove through two or more patches of fog, sometimes switching his lights from bright to dim and slowing. Defendant saw Frank's car parked on the northbound shoulder which had no lights or flares to warn of its presence. Upon passing Frank's car, defendant entered another light patch of fog. Frank's car was parked about 225 feet south of the point of impact. Defendant said as he came out of this patch of fog, he saw the couple embraced and motionless in the highway, immediately hit his brakes and attempted to swerve to his left.
This scale drawing depicts the relationship and distances between the persons and things from Frank's parked automobile to the truck stop:
*841 *842 Defendant told the investigating officer: We went through some fog and then we saw a car [parked] on the right. We passed the [parked] car, then right past the car there was two people in the road... I swerved to the left and tried to miss them ... Our lights were on dim and they just seemed to appear right in front of the car. Then we swerved to miss them, but they were too close. Then we hit our brakes ... We were going between fifty and fifty-five. Because of the fog we could have ... been running slower.
Defendant's wife told this officer:
We were driving in fog patches ... when we saw a car parked on the right side of the road. About then we went into another fog patch and the next thing we saw was two people standing on our side of the road ... [My husband] slammed on the brakes, then swerved ... and tried to miss them ... [He] was driving between fifty and fifty-five miles per hour.

TRIAL COURT'S FINDINGS
The trial court found
[Defendant and his wife] acknowledged they were traveling at a speed of approximately 55 miles per hour. However, they explained that as they entered the first patch of fog, [he] decelerated and switched his lights from bright to dim, and in the course of traveling through two or three patches of fog, at trial they estimated their speed at the time of the accident at 40 to 45. They observed the Minchew vehicle on the northbound shoulder of the road as they passed, with no lights, warnings or flares. Immediately upon passing the vehicle they entered another light patch of fog. As they emerged from the last patch of fog, both of them observed two persons in [what they described as] dark clothing standing motionless and embraced in the center of the northbound lane of travel in which they were traveling. They both testified that [defendant] immediately hit his brakes and attempted to swerve to the left. [He] was unable to avoid impact and the front right portion of his vehicle struck the couple ... [H]e eventually rolled to a stop 435 feet from the point of impact near the front of the Truck Stop. He and his wife ran to the Truck Stop and reported hitting two persons and asked that an ambulance be called.... * * *
Defendant testified the pedestrians were 75 to 100 yards from the parked car, explaining, "it was dark and foggy and I can't judge that distance." Defendant testified that he had entered another patch of fog near the parked car. He told the investigating officer that his lights remained on the "dim" beam when he came out of this patch of fog and first saw the pedestrians. At trial he said he forgot to tell the officer that he put his lights on bright after going through this last patch of fog. Defendant testified he saw the standing pedestrians when he put his lights on the bright beam while driving "45 to 50" mph. Our emphasis.
The trial court found that the fog bank just south of the point of impact did not greatly or materially impair the visibility of the defendant motorist, but simply made it more difficult to see a couple in the roadway who were wearing "dark clothing, embraced and motionless."[2] The trial court further concluded that the visibility of the motorist for expectable obstructions in the roadway was not materially impaired by the 50 yard wide patch of fog out of which defendant drove before colliding with the pedestrians. The trial court reasoned that a motionless couple standing in the roadway was an unusual, extraordinary, *843 and unexpected occurrence which would relieve or excuse a motorist from the duty of adjusting his speed, observation, and control to a degree commensurate with weather and highway conditions. Our analysis causes us to disagree and conclude to the contrary.

RESOLUTION OF SCOPE OF DUTY
The most exasperating and elusive torts problem with which a judge must contend includes the task of determining how far legal protection should extend. The problem has spawned "an amazing variety of nonsense phrases ... inconsistent banalities which courts ... everywhere ... have solemnly pronounced in decisions over past years." Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363 (1969-70). The cases, before and after Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962), have produced inconsistent language, but the facts of each case when analyzed as directed by Dixie, by Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970), and by Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972), support the individual result in each case, notwithstanding inconsistency in the "rules" some-times loosely applied. Malone, supra; see also Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L.Rev. 1 (1973).
Dixie, Pierre, Hill and their progeny condemn "rules" and commend the constructive approach or the preferred dutyrisk analysis. See generally the law review articles by Professors Malone and Robertson, cited supra. See also Robertson, Ruminations on Comparative Fault, Duty-Risk Analysis, Affirmative Defenses, and Defensive Doctrines in Negligence and Strict Liability Litigation in Louisiana, 44 La.L.Rev. 1341 (1984).
Foreseeability or expectability, however, is not to be used as the test or the rule to determine the scope of a motorist's duty.
Foreseeability is not always a reliable guide, and certainly it is not the only criterion for determining whether there is a duty-risk relationship. Just because a risk may foreseeably arise by reason of conduct, it is not necessarily within the scope of the duty owed because of that conduct. Neither are all risks excluded from the scope of duty simply because they are unforeseeable. The ease of association of the injury with the rule relied upon, however, is always a proper inquiry. Prosser, Law of Torts (3rd ed. 1964), 282 ff.
Where the rule of law upon which a plaintiff relies for imposing a duty is based upon a statute, the court attempts to interpret legislative intent as to the risk contemplated by the legal duty, which is often a resort to the court's own judgment of the scope of protection intended by the Legislature. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298; Pierre v. Allstate Ins. Co., supra.

Hill v. Lundin & Associates, Inc., 260 La.2d 542, 256 So.2d 620, 622 (1972).
There is no test or rule by which the extent of the duty may be determined. Instead, scope of duty questions are to be resolved by inquiring into the purpose of the rule and into whether the particular plaintiff is among those persons the rule was designed or intended to protect. The inquiry has become established or known as the duty-risk analysis, of which foreseeability is but one factor, not necessarily controlling. The analysis is merely an analytical technique to be employed in an area of the law that requires careful reasoning and articulation, and is not itself a rule or test. See law review articles cited supra, and Johnson, Comparative Negligence and the Duty/Risk Analysis, 40 La. L.Rev. 319 (1980).
... The obvious starting point was Dixie Drive-It-Yourself System v. American Beverage Co. [242 La. 471, 137 So.2d 298 (1962)]. There, the Louisiana supreme court, concerned to defuse and de-rigidify a "passive negligence" formula, for *844 the first time clearly prescribed that problems of the extent of liability of a violator of a relevant statute be approached in terms of "whether the risk and harm encountered by the plaintiff fall within the scope of protection of the statute." The importance of the Dixie decision has been well recognized, it changed the thinking of the Louisiana courts respecting the appropriate range of inquiry in statutory negligence cases, and has had dramatic effect in cases involving breach of case law duties as well. Still, of the more than 130 decisions ostensibly relying on the Dixie case, most continue to employ causation language to refer to issues other than cause-in-fact, occasionally to the complete detriment of clarity of analysis and correctness of outcome. Further, even the rather clearcut admonition against automatic employment of the "passive negligence" notion has sometimes been ignored. All in all, the picture that emerges is that the courts of appeal have been willing to employ the language of the Dixie formulation, but that they have often wished to cling to other, partially inconsistent notions that seem to provide more specific guidelines. Courts may say that "each case must be decided on its own facts," that "no rule ... can be laid down"; but rules have a powerful appeal to busy judges, and apparently will be found or created whenever the psychological need is strong enough.
Still, the Dixie approach is clearer and more straightforwardly policy-oriented than its predecessor; it has been influential; and even a limited success is encouraging. On two levels, the Hill decision presents a major step forward in a trend that may be said to have begun with Dixie. First, on the technical level of operating the duty-risk approach, it teaches ... the appropriate range of inquiry in negligence cases (whether the duty allegedly breached be a statutory provision or a case-law duty). * * *
The keys for the solution of the issue of responsibility when there is more than one cause-in-fact of damages are (1) a determination of the exact risk or risks anticipated by imposition of the legal duty which has been breached and (2) the legal or policy considerations which grant excuses from certain consequences which follow an act of negligence. This requires, under the facts and the law of each case and the attendant exigencies, a jurisprudential determination which will implement and make effective our broad codal provisions concerning those who should respond in damages for their fault. (Their emphasis.) (Citing Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821, 831 (1971))
34 La.L.Rev. at pp. 15-20, 23. Footnotes omitted.
We shall proceed to make the analysis as directed by the supreme court.
Resolution of the difficult scope of duty question must begin by recognizing two entirely different inquiries, one of fact (cause-in-fact), and the other, of legal policy. See Malone, 30 La.L.R. at 369-370.

SOURCE OF DUTY
Several sections of LRS Title 32 expressly and impliedly contemplate that both pedestrians and confused or incapacitated persons may confront a motorist traveling on a roadway.
Notwithstanding that pedestrians are required to walk, when practicable, only on the left side of the highway or its shoulder in the face of approaching traffic where no sidewalks are provided (§ 216 B), § 214 imposes this further and specific duty on the motorist:
Notwithstanding the foregoing provisions of this Part, every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a highway. Emphasis supplied.
*845 The statutory or posted speed limit on Highway 65 is 55 mph. LRS 32:61, 63. Notwithstanding these sections, § 64 A provides:
No person shall drive a vehicle on the highway within this state at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather, ... Emphasis supplied.
Additionally, a driver is required to maintain reasonable control of the vehicle he is operating (§ 58) and to have lights that afford him a visibility during the nighttime of persons and vehicles at least a distance of 500 feet ahead at high beam and of 150 feet ahead at low beam. § 321(1), (2). A driver of a private automobile is required to have brakes which will enable him to stop within 25 feet after applying the brakes while traveling at 20 mph. § 342 A(3).
Baumgartner v. State Farm Mut. Auto. Ins. Co., 356 So.2d 400 (La.1978), considered the comparative risk in auto-pedestrian cases with the general duty of a motorist toward a negligent pedestrian and the specific duty of that motorist toward a negligent pedestrian in a city cross-walk. The general duty was expressed:
[T]he operator of a motor vehicle creates a great risk of injury ... he owes a duty to the public to protect it from that danger. The pedestrians, on the other hand, endangers himself only, therefore his duty is owed primarily to himself. The motorist runs small risk of harm ... from a pedestrian's negligence.
Since the operator of a motor vehicle is aware that he could meet many emergencies in which pedestrians will not always act prudently and will sometimes be found in perilous situations, he should have the additional burden of keeping the roads safe even for those who are caught off their guard.
356 So.2d at 406. See also Turner v. New Orleans Public Service Inc., 471 So.2d 709 (La.1985).
The motorist has a duty to see what he should see:
"[it is] well settled ... that the first duty of a [motorist] is to keep a sharp lookout ahead to discover the presence of those who might be in danger." Rottman v. Beverly, 183 La. 947, 165 So.153, 156 (1935).
"... failure to see what ... could have been seen by exercise of due diligence does not absolve a motorist from liability." Jackson v. Cook, 189 La. 860, 181 So.195, 197 (1938).
A motorist cannot escape liability by showing that the pedestrian who was in peril because of his own negligence could have avoided injury more easily or quickly than the motorist. Last clear chance does not apply to absolve a motorist from liability to even the negligent pedestrian. Cases which held that the pedestrian had the last clear chance have been expressly disapproved. Baumgartner, at pp. 406-407. The comparative negligence law is a superior solution and is to be applied to auto-pedestrian cases. Turner, supra.

CAUSE IN FACT?
Cause in fact is a "but for" inquiry into the logical, and not absurd, extremes. See Malone, Ruminations, supra.
The evidence conflicted as to the extent the fog impaired visibility. The trial court's conclusion was that the fog bank just south of impact did not greatly impair defendant's visibility, but simply made it more difficult for him to see the couple in the roadway.
Defendant explained at trial that he would decelerate from his admitted speed of 55 mph and would dim his lights when he encountered fog. At best, and giving deference to the trial court's findings but considering defendant's testimony, we must find that defendant decelerated to not less than 45 mph. Defendant said he saw *846 the couple when he put his lights on bright when he was driving 45 to 50 mph.
To whatever degree the patchy fog made defendant's vision more difficult, defendant consciously chose to reduce his speed to a much lesser degree (55-45 mph) than he reduced his illuminated vision from high beam (minimum 500 feet) to low beam (minimum 150 feet). Tammie and Frank were standing 225 feet north of Frank's parked car. Defendant saw the unlighted parked car. He knew he was approaching the truck stop and restaurant which was open all night. Frank and Tammie were visible to Mike who was 150 feet north of them. A color photograph (J-3) of Frank's body covered with a white sheet shows one sleeve of the short sleeved shirt Frank wore. The shade or tone of the sleeve is closer to the white of the sheet than to the dark blue of the uniform of the trooper who also appears in the photo. Defendant was not maintaining the diligent lookout the law requires. If the fog made it more difficult for defendant to see, as the trial court found, defendant was driving too fast under the circumstances.
If the fog was as light and did not materially affect his vision, as the trial court found, defendant's deliberate choice to reduce his illumination from high beam (minimum 500 feet) to low beam (minimum 150 feet) materially reduced his vision. This was conduct, but for which, the accident would not have happened.
If the fog materially affected his vision and was sufficient to require defendant to dim his lights in order to improve his visibility, defendant's conscious choice to reduce his speed only by about five or ten miles an hour was conduct but for which the accident would not have happened.
The conduct of the pedestrians should be measured by the same "but for" inquiry. But for their conduct standing in the middle of the northbound lane, the accident would not have happened. Without belaboring the issue and reiterating the circumstances, we hold that the respective conduct of each pedestrian and of the motorist were causes in fact of the collision.

THE POLICY INQUIRIES
Why did the Legislature adopt statutes imposing the stated duties of motorists toward pedestrians and incapacitated persons on the highway? What risks were in mind? Did the Legislature envision a drunk pedestrian standing motionless on any highway? What risks did the Legislature have in mind when it required a motorist to adjust his speed and control to highway and weather conditions? See Malone, Ruminations, supra, at 377. Another specific inquiry suggested by Dixie Drive It Yourself may be paraphrased:
Would the court's denial of recovery because of the pedestrian's negligent exposure of himself render the protection of the statute meaningless.
137 So.2d at 306.
We believe the pre-Turner pedestrian cases and Turner, supra, answer the policy inquiries. The Legislature has not limited the duty of a motorist to keep a proper lookout, to use due care and proper precaution and to adjust speed to road and weather conditions only to pedestrians on urban streets. Neither shall we. The most obvious reason why the statutory, and case law, duties have been declared is to protect against the risk that a pedestrian may have negligently placed himself in a position of peril, whether on an urban or rural roadway. A motorist is legally held to be aware that he will meet many emergencies in which pedestrians will be found in perilous situations. 356 So.2d at p. 406. A negligent pedestrian may recover from a negligent motorist. Turner, supra.
Defendant argues that such cases as Aetna Cas. and Sur. Co. v. Nero, 425 So.2d 730 (La.1983), and Bunkie Funeral Home, Inc. v. McNutt, 414 So.2d 1263 (La. App.3d Cir.1982), should control the duty question in this case. We cannot agree. This case hinges upon what this defendant should have seen under the circumstances and upon what speed defendant should have been driving under the circumstances of patchy fog. As the Nero court distinguished *847 Nero from Baumgartner, we distinguish Nero:
The driver [here] saw the pedestrian[s], applied his brakes in an attempt to stop... the victim[s] could [or should] have been seen [at a greater distance]; thus the driver could have avoided the accident by slowing down.
425 So.2d at 733.
The supreme court emphasized that Ms. Nero could not, should not, and did not see the drunk pedestrian (.45 grams percent blood alcohol) before impact and that she was driving 10 miles under the 35 mph speed limit on a clear and dark night. The trial court in Nero found that the pedestrian ran in front of the car. The court of appeal suggested the pedestrian may have been laying in the street and was "getting up" in front of the car. 415 So.2d 390, 392 (La.App.1st Cir.1982).
McNutt, supra, reiterated the rule stated in a 1936 case that a motorist at night is not charged with the duty of guarding against striking an unexpected or unusual obstruction which he had no reason to anticipate he would encounter on the highway. In McNutt, the unexpected and unanticipated object was the dead body of a black calf.[3] The Legislature has not anticipated that dead calves will confront a motorist, but has anticipated, in our view, that pedestrians or incapacitated persons will. Additionally, we note that the application of the humanitarian doctrine to pedestrian-motorist cases has been expressly approved in Louisiana. Baumgartner, fn. 6, p. 405.
In short, we find no policy reasons, moral, social, or economic, in case law or elsewhere, why the motorist's statutory duty does not extend to the negligent or incapacitated plaintiff-pedestrian standing motionless on a rural highway. We find no policy reasons to excuse a motorist in the circumstances of this defendant from the duties imposed by law.

BREACH OF DUTY
The next inquiry is whether the motorist breached his duty. If he did not see and should not have seen the pedestrian and was traveling at a reasonable speed, as in Nero, supra, the motorist is not at fault. If the motorist could not have seen the pedestrian in time to avoid her, he is not at fault. Williams v. State Farm Mut. Auto. Ins. Co., 444 So.2d 1341 (La.App.2d Cir. 1984), writ denied.
Unlike Ms. Nero, this defendant saw the pedestrians standing in the roadway. At best, defendant said he saw the plaintiffs standing in the roadway when he put his lights on high beam while traveling 45-50 mph. Once he saw them, he reacted, put on his brakes and left only about 20-25 feet of skid marks (27 feet total before and after impact) before the right front corner of his car hit them, propelling them 74 or more feet north.
No other traffic was involved. Defendant had more than one-half of the northbound lane (7 feet) plus 22 feet of the southbound lane and its paved shoulder, or 29 feet of paved surface, in which to maneuver. The motionless pedestrians created only 4-5 feet more hazard to the motorist than did Frank's car that was parked on the paved shoulder 225 feet south. Defendant saw and safely traversed the area of the parked car. If defendant could not have seen plaintiffs before he saw them because of the fog and low beam illumination, he was driving at a speed (45-50 mph) unreasonable under the circumstances. If the density of the fog did not legally justify defendant driving at 45-50 mph on low beam, his driving on low beam posed an unreasonable risk of harm to plaintiffs. Defendant could have avoided the accident either if he had been driving slower in the fog on low beam or if, unimpaired by fog, he had had his lights on high beam to afford him maximum visibility.
*848 Accordingly, we find the defendant comparatively negligent.

QUANTUM: TAMMIE FINLEY
Tammie's left leg was fractured and dislocated; the ligaments of her left knee were permanently damaged; her right leg was broken in four places and never healed properly (even though the leg was under constant and often painful medical treatment for two years). Her right leg was eventually amputated below the knee. Her punctured bladder required surgical correction; her arms, legs and head were lacerated; her pelvis was fractured in several places. She was hospitalized in Vicksburg, Mississippi, for six days, and in Monroe for 15 days. She remained under medical care through and past trial, more than two years after the accident.
Tammie was 20 years old when the accident occurred. She has a ninth grade education. She had worked as a security guard, a waitress, a highway flagger, and an assembly line worker earning $5-$6 per hour. There was a discrepancy whether Tammie had been unemployed for over a year previous to the accident or only a period of months prior to the accident. At a deposition prior to trial she said one year, four months; at trial she said she had been employed until about two months before the accident. She explained her deposition answer by saying that she had been confused at the deposition.
Tammie's petition lists $14,726.21 as past medical expenses and $10,000 in expected future medical expenses. Copies of the medical bills for past medical expenses were introduced.
Drs. Bailey, a Monroe orthopedist; Evans, a Vicksburg orthopedist; Weinberger, a Vicksburg urologist; and Kellum, a Vicksburg surgeon, testified by deposition. Letters concerning Tammie's medical care from Dr. Vyhmeister, Dr. Evans' partner in orthopedics; Dr. Kieffer, a Wyoming orthopedist; Dr. Liles, a Monroe urologist; and Dr. Norris, a Monroe family practitioner, were also introduced.
Dr. Kellum, the treating physician at the Vicksburg emergency room, discussed the injuries and treatment we have detailed above. Dr. Weinberger detailed the procedure used in repairing Tammie's punctured bladder immediately after the accident. Dr. Liles explained the bladder recovery.
Dr. Bailey explained his treatment of Tammie's legs through June 3, 1982. Tammie had serious orthopedic problems which required constant and careful treatment.
Dr. Evans and Dr. Vyhmeister detailed the more recent orthopedic treatment she received on her right leg. Besides casts and bone grafts Tammie was subjected to electromagnet therapy. Amputation has occurred. Dr. Evans gave Tammie a 25 percent total body disability positing recovery of the right leg without amputation. No evidence of disability post-amputation was adduced.
The injury to the ligaments of the left knee are not discussed in Dr. Evans' deposition. The only evidence regarding the ultimate prognosis of Tammie's left leg is Dr. Kieffer's August 16, 1982, letter in which he explains that on August 11, 1982, she was "ambulating well on crutches and was full weight bearing on both extremities * * * The left knee has full active and passive motion with about a 15° extensor lag * * * Her left knee is, of course, unstable and probably will require reconstructive surgery in the future."
Dr. Norris' letter of March 19, 1984, indicates that Tammie suffered significant mental distress in 1982 and 1983.
After a review of all the evidence, we consider that the following amounts would be just reparation for Tammie's damages:

Specials, past and future $24,000.
General damages 250,000.
Loss of earning capacity 150,000.
 _________
TOTAL $424,000.

QUANTUM: FRANK MINCHEW
Frank Minchew was 23 years old at the time of his death. For three or four years before his death Frank had given his elderly widowed mother $200 per month to *849 help with household expenses. Frank worked offshore and would be gone 7-10 days and then return to Newellton to reside with his mother for 5-7 days. Frank had an eighth grade education.
Mrs. Minchew, who testified, but who died after trial, described her relationship with Frank as "good." She said that she missed her son very much.
Mrs. Minchew acknowledged that Frank had two or three DWI convictions, that he used marijuana as a "pastime," that he had spent time in LTI when a juvenile, that he had been convicted for felony theft as an adult, and was out on parole when fatally injured. She testified that she fished with Frank, occasionally shot pool with him and celebrated some holidays with him.
Frank had two brothers, three half sisters, and one half brother. His mother, who was 68 in 1983, testified at trial in 1984 that she had terminal cancer.
The record indicates Frank died within 30 minutes of the accident without gaining consciousness. We award Mrs. Minchew's heirs, the substituted parties plaintiff, the amount we would have awarded her had she lived, $3,000 for special damages for Frank's funeral and interment, and $75,000 general damages. Cf. Guillot v. Fisherman's Paradise, Inc., 451 So.2d 568 (La. App.1st Cir.1984).

COMPARATIVE NEGLIGENCE ALLOCATION
We agree with Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La. 1985), that the allocation of shares of negligence "is not an easy task for the fact-finder..." We attempt to "render [a] judgment which is just, legal, and proper upon the record on appeal." CCP Art. 2164. Noting the directions of the supreme court in Watson, we consider "both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." We consider
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
469 So.2d at 974.
It is of no avail to the motorist that the pedestrian in peril might have avoided injury more quickly, or easily, than the motorist. The concept of last chance should not be taken literally where a mutuality of risks is lacking. Baumgartner, supra, fn. 8, p. 406.
The proportionate percentage of fault should be based on considerations of the respective degree of duty of the pedestrian and the motorist and the degree of causation involved in each parties' breach of that duty. J. Lemmon, concurring in Turner, supra, at 715. Turner apportioned negligence 90 percent to the motorist.
If Tammie and Frank had been less inebriated, they would have been in a better position, mentally and physically, to react to what they should have seen and heard. While the risk created by their conduct is small and inconsequential when compared to the risk created by the motorist's conduct, the degree of their incapacity is greater than drunk, but mobile, pedestrians. Frank's blood alcohol was .28 grams percent.
The motorist's negligent conduct was in part conscious, but mostly inadvertent. The risk created by his conduct was small in probability but great in consequence and affected the public more than the risk created by the pedestrians. The value of what, if anything, defendant sought by his conduct is also insignificant. The capacity of the motorist was not limited but was relatively greater than the pedestrians, considering their condition. We find no significant circumstances or policy reasons to extenuate or excuse the conduct of either the pedestrians or the motorists.
*850 When we increase or decrease damages awarded by a trial court we do so in accord with the directions of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). In modifying a trial court's allocation of negligence under CC Art. 2323, we see no reason why such directions are not analogous and proper. Accordingly, and considering that the trial court found the drunk, motionless, and oblivious plaintiffs to have been greatly or wholly at fault, we fix the negligence of Tammie and of Frank at the highest percentage we would have affirmed, 70 percent. Defendant's negligence is fixed at 30 percent.

DECREE
We reverse and render judgment in each case for the respective plaintiff or plaintiffs.
(A) Judgment is rendered in favor of the heirs of Flora Minchew (the substituted parties plaintiff) and against Philip S. Scurria, III, and Northern Assurance Company of America in solido (and only to the extent of the insurer's liability coverage) for 30 percent of $78,000, or $23,400, with interest from judicial demand.
(B) Judgment is rendered in favor of Thomasa Lynn Finley and against Philip S. Scurria, III, and Northern Assurance Company of America in solido (and only to the extent of the insurer's liability coverage) for 30 percent of $424,000, or $127,200, with interest from judicial demand.
Defendants in each case are also cast with costs here and below, including expert witness fees as the same may be agreed to by the litigants or fixed by the trial court after hearing. We remand to allow the trial court to fix the costs and resolve the dispute, if any, as to the amount of liability coverage.
REVERSED, RENDERED, and REMANDED.
HALL, C.J., dissents with written reasons.
SEXTON, J., dissents with written reasons.
HALL, Chief Judge, dissenting.
As I appreciate the majority opinion, the defendant driver is found negligent in that he failed to sufficiently reduce his speed considering the patchy fog and the use of his dim lights, and in that he was not keeping a proper lookout for pedestrians on the highway. In my judgment there was no duty on the part of the defendant to reduce his speed on the highway below 45-50 miles per hour under the prevailing circumstances. His failure to see the motionless victims in time to avoid hitting them does not establish that defendant was not keeping a proper lookout. I would affirm the district court finding that defendant was free from fault, and therefore respectfully dissent from the reversal of the district court judgment.
SEXTON, Judge, dissenting.
Believing that the fact finder was correct in his failure to find fault on the part of the defendant driver, I cannot subscribe to the proposition that he was manifestly erroneous. Just as in Thissel v. Commercial Union Insurance Company, 476 So.2d 851, also handed down this day, I do not believe that this night driving motorist should be charged with avoiding an obstacle which he had no reason to anticipate under the circumstances. Aetna Casualty and Surety Company v. Nero, 425 So.2d 730 (La. 1983); Calais v. Thibodeaux, 220 So.2d 209 (La. App.3d Cir.1969), writ refused, 254 La. 15, 222 So.2d 67 (1983). I simply do not see a duty that this motorist breached and respectfully dissent from the award of damages.
Parenthetically, I have great difficulty with the extent of negligence assessed this motorist, assuming his fault arguendo. The allocation of fault in the amount of thirty percent in this case makes the three pedestrian automobile cases handed down this day irreconcilable, in my view.
NOTES
[1] LRS 32:213 A. reads:

Every pedestrian crossing a roadway at any point other than within a marked cross walk or within an unmarked cross walk at an intersection shall yield the right of way to all vehicles upon the roadway. § 214 reads:
Notwithstanding the foregoing provisions of this Part, every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a highway.
§ 216 B. reads:
Where sidewalks are not provided, any pedestrian walking along and upon a highway shall, when practicable, walk only on the left side of the highway or its shoulder, facing traffic which may approach from the opposite direction.
[2] The adjective dark is not a factual finding but a comparative to light clothing. We prefer the description of the victim's clothing such as blue jeans, cream colored blouse, red and blue shirt, to the conclusion of dark clothing. A color photograph (J-3) of Frank's sheet-draped body on the highway shows Frank's left arm and short sleeve shirt. The shirt sleeve simply cannot be called "dark." The finding that the couple were embraced and were motionless, of course, is a finding of fact which is not disputed.
[3] Other similar cases are: Rayford v. Saia Motor Freight Lines, 442 So.2d 548 (La.App. 1st Cir. 1983); writ denied; Jeter v. Marse, 460 So.2d 711 (La.App. 3d Cir.1984), writ denied; and Bink v. Blackwell, 429 So.2d 228 (La.App. 5th Cir.1983), modified on other grounds, 432 So.2d 296 (La.App. 5th Cir.1983).