632 So.2d 384 (1994)
Samuel MYLES, Plaintiff-Appellant,
v.
Robbie N. TURNER and Automotive Casualty Insurance Company, Defendant-Appellee.
No. 24198-CA.
Court of Appeal of Louisiana, Second Circuit.
January 19, 1994.
*385 Bruscato, Loomis & Street, Monroe by Anthony J. Bruscato, for plaintiff-appellant.
Hudson, Potts & Bernstein, Monroe by Brian D. Bowes, for defendant-appellee.
Before MARVIN, C.J., and SEXTON, NORRIS, LINDSAY and WILLIAMS, JJ.
MARVIN, Chief Judge.
A five-judge panel was created in this appeal when one judge of the original three-judge panel dissented to a proposed reversal of the trial court's judgment that rejected plaintiff's demands in this personal injury action. LSA-Const. Art. 5, § 8.
On reargument, we affirm the judgment.
The action was brought by Samuel Myles, who was either an "incapacitated person" or a "pedestrian" under La.R.S. 32:214. He alleged that the defendant motorist, Ms. Turner, negligently struck him with her vehicle during the pre-dawn hours on June 6, 1991, when he was walking on a residential street in Monroe.
Upon admission to the hospital Myles was found to be intoxicated (.18 gms. percent blood alcohol). Three persons, including Ms. Turner, telephoned police about seeing Myles being, laying or sleeping in or near the street. After he was injured he was seen sitting and standing, attempting to walk away from the investigating officer. Myles did not know what happened to him. Ms. Turner could only express how she was driving and what she "determined," "felt" or "thought" about her vehicle or the wheel thereof striking Myles, causing her to stop and see him and then to telephone police.
The trial court found that Myles had not shown that Ms. Turner's vehicle struck him and further that if Myles "was struck by an automobile, it was because, considering the total circumstances, he simply could not be seen."
The case thus rests on circumstantial evidence. Whether Myles met his burden of proving Ms. Turner's negligence primarily presents a factual issue dependent upon the reasonableness of the ultimate conclusion to be drawn from the evidence. We review the record on appeal in the light that most favorably supports the trial court's judgment.

LAW
The duty owed by a motorist to either a pedestrian or an incapacitated person on a roadway is generally stated in the statute and has been jurisprudentially recognized:

[E]very driver ... shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing... any confused or incapacitated person upon a roadway.

§ 214 in part. Emphasis supplied.
See and compare Baumgartner v. State Farm Mut. Auto Ins. Co., 356 So.2d 400 (La.1978); Turner v. New Orleans Public Service, Inc., 471 So.2d 709 (La.1985); Finley v. North Assurance Co. of America, 476 So.2d 837 (La.App.2d Cir.1985), writ denied, and Aetna Cas. and Sur. Co. v. Nero, 425 So.2d 730 (La.1983).
Even the Baumgartner ruling that was designed "to compensate for the lack of mutuality of risks between motor vehicles and pedestrians" before the advent of comparative fault and to "avoid the harsh results of contributory negligence ... did not impose absolute liability on a driver of an automobile simply when there is a collision between a car and a person." Nero, p. 733. Indeed the supreme court there explained in fn. 7: "This Court has never held that a driver is strictly liable in all automobile pedestrian accidents." Our emphasis.
The above-cited cases perfectly illustrate why each auto-pedestrian or -incapacitated person case should rest on its own particular facts. Finley and Baumgartner, cited supra, which imposed liability on the motorist, emphasized among other detailed factors, the distance at which the pedestrian or incapacitated person could have or should have been *386 seen under the particular respective circumstances. Nero, reaching the opposite result, emphasized "[i]t could not be determined how [the intoxicated decedent] made his way into the path of Ms. Nero's car" which struck him on a dark night on a four-lane undivided street in Baton Rouge. 425 So.2d at 732.
The appellate opinion in Nero thought it speculative that the incapacitated person with a .47 blood alcohol level "walked or staggered in front of the vehicle," saying that there were other "reasonable possibilities,... he was either standing relatively still or was just getting up out of the middle of the street when he was struck." Aetna Cas. & Sur. Co. v. Nero, 415 So.2d 390, 392 (La.App. 1st Cir.1982), writ granted. Reversing the trial court in a 3-2 opinion, the appellate court rendered judgment finding the motorist liable. After granting discretionary review, the supreme court reversed, reinstating the trial court's judgment while emphasizing the absence of evidence establishing at what distance the pedestrian or incapacitated person could have been seen by the motorist, Ms. Nero.

FACTS
On Saturday night, June 1, 1991, Samuel Myles, age 37, and two friends visited at his relative's home in which he resided in the Monroe neighborhood where he suffered his injuries. Myles and one friend went to a nearby bar where he consumed a 40-ounce malt liquor and five or six glasses or cups of whiskey poured over ice. He and a girlfriend left the bar about 1:30 a.m. to eat at a late night grill. After leaving the grill and walking this girlfriend to her home where he remained for a short time, Myles departed, intending to walk to the home of another girlfriend in the neighborhood.
Myles's petition alleged that he was walking north on Georgia street when he was struck by Ms. Turner's vehicle. Myles testified, however, that he was walking in a southerly direction on the right side of the street while wearing an orange T-shirt. He said he was struck from behind on his left side by the vehicle, but said that he could not remember hearing or seeing a vehicle or its headlights. He alleged that his body was spun around by the impact and he came to rest on his back.
The record belies his testimony that he was wearing an orange, or any color, T-shirt, that he was not drunk and that he did not lay down or nap or sleep in or near the street.
Myles finally explained or acknowledged that he did not know what happened to him or the exact time it happened. He said the last thing he clearly remembered was walking past a church that was about a block north from where he was found. After the investigating officer arrived, Myles was taken to a Monroe hospital by ambulance.

911 TELEPHONE CALLS
Beginning about 5:30 a.m. Sunday morning, June 2, three successive telephone calls within about six minutes were made to the 911 number connected to the Monroe police department. These calls collectively reported a "guy, drunk, asleep," a "black male laying in the street," "a man" in Georgia street. The third of the calls was made by Ms. Turner, the defendant.
The first caller, most probably a motorist but otherwise unidentified, reported that he had seen a guy, drunk and asleep in the street, that he stopped his vehicle and tried to wake the sleeping man, who only mumbled and went back to sleep. The second caller, unidentified either as a pedestrian or motorist, reported a man laying in the street in the same location. Ms. Turner's call, recorded about six minutes after the first call, reported "I just ran over somebody, a man who was laying in the middle of the street ... and I saw blood ... on the side of his face."
Police Officer Crump arrived at the scene within one or two minutes after Ms. Turner's call. He was responding to one of the earlier calls when the third call was relayed to him. Crump found Myles lying partly in the northbound lane of the street, "hollering," "moaning," and smelling strongly of alcohol, and wearing a pair of pants, but no shirt. Crump remembered that Myles was not wearing a shirt because an abrasion on Myles's naked shoulder was clearly visible. Crump testified that Myles finally responded to his inquiries, telling Crump he was "okay" after a few *387 minutes and then trying to walk away. Crump detained him to await the arrival of the ambulance.
The record shows no detail of Georgia street, only that is it is a paved, but pot-holed, narrow two-lane street running north and south, that is "poorly lighted." On each side of the street is an "open ditch," and no sidewalks, curbs or gutters, according to Crump. Ms. Turner, however, answered "yes" to Myles's counsel who stated: "And there are no curbs ... no ditches. The grass areas from the houses come right up to the street?"
Giving no dimensions, Crump said the street was not a "wide two lane opposing road," but just a "normal side street," with a "few potholes," while denying that Georgia street had a "lot of room for pedestrians and two-way traffic."
Officer Crump testified that Ms. Turner, who lived about one and one-half blocks south of where Myles was found, identified herself as a telephone caller and as driving a GMC "Jimmy." This vehicle was returned to the scene by Ms. Turner's husband after she made the 911 call from their home and immediately walked back to the scene. Crump said his investigation "went by what [Ms. Turner] told me approximately happened."
Ms. Turner was going to work that Sunday morning at the West Monroe Guesthouse where she was regularly employed on weekends. She told Crump that she was driving north on Georgia Street with her headlights on when she felt her GMC Jimmy hit a bump with her right front tire or the right side of her vehicle, "and at that point, she said she turned around at Stockton [street] to see what she had rolled over and ... saw Mr. Myles laying half in the grass and half out on the shoulder of the road there." Crump explained that Stockton street was about 50 feet north of the scene. Crump said Ms. Turner told him the "bottom part of [Myles's] legs were in the grass." When she turned to see what she had hit, she saw Myles laying half in the grass and half on the shoulder of the road [without a shirt on]. She turned her vehicle around, determined that Myles was okay, and returned to her home to call the police, according to Crump.
Crump's accident report noted Ms. Turner as going 25 miles per hour, but she testified that she never stated that she was going this fast, but was in fact traveling about 10 to 15 miles per hour and observing the street ahead of her. She explained she could not travel any faster because of the many potholes in the street, toward which she directed her attention.
Ms. Turner testified that she felt her tire hit a bump and applied her brakes, explaining that she first saw Myles in her rearview mirror, sitting behind her car, "inches" away illuminated by her taillights.
Noting that Ms. Turner indicated to him that she "thought" she had rolled over Myles with her right front tire and that "she didn't indicate she'd seen anything until after she felt a bump and then turned around," Crump testified he and another officer "looked over [her] vehicle carefully ... the front parts, down both sides, [and found no indication near the tire or the underside of any body being rolled over]." He said he found nothing on the road surface to indicate where "there might have been some debris or [where] the vehicle or body [was] at the time of impact." He agreed that "we looked" and could not find anything to indicate an answer to whether or not Ms. Turner's vehicle struck Myles.
Crump noted that Myles was found in front of an empty lot at 2603 Georgia. Ms. Turner testified she lived with her husband one and one-half blocks south of that address. She said: "I felt ... maybe the [right front] tire ... [was] slightly stuck in the ditch.... I heard a bump ... stopped cause I wanted to see what I run over ... looked in my mirror ... I could see a person who was sitting up ... trying to stand up. I immediately turned around on Stockton ... I asked him ... are you okay? He said `yes, I'm fine.' I [told him to] stay right there. I'm going to call the police and he told me don't call the police.... And I went home and called 911. [When I first saw him he was on the right side of the northbound lane near the shoulder but in the road, about] half and half. [My headlights] was fine. The reason [I didn't see him] is Mr. Myles didn't have on *388 a shirt. He was laying in the road and there was poor lighting.... There was no lighting were the accident took place at. No street lights."
Ms. Turner explained that while she did not see anything on the street as she was proceeding northerly, she was able, after she stopped, to see Myles in her inside mirror illuminated by her brake lights: "Yes, I could see [him] because at this point, he was not laying down. He was like up. He was sitting up and trying to stand up." She said she did not "feel" that the right front end of her vehicle struck Myles, but she thought it "was possible" that her right front tire struck him.
Ms. Turner, whose married name is Mrs. Robert McElhanon, lived with her husband at 2902 Georgia Street. She testified she was driving to work that Sunday morning as she regularly did, with her vehicle headlights on, proceeding slowly, less than 25 mph "so I would not hit any potholes serious hard." Asked whether the "bump" she encountered with her vehicle was on the left, right, front or rear of the vehicle, she answered: "I don't know. I don't know for sure ... my determination it was on the right side.... I didn't see it. But that's just the determination that came to me.... I hit the bump. Then ... I hit my brakes. [I saw him in my rearview mirror] ... on the right lane [and shoulder] ... half and half ... on the right side of the northbound lane ..."
The trial court mentioned its familiarity with the area. The medical records understate that Myles "doesn't remember incident well ..."
The orthopedist who treated Myles's injuries (abrasions and a fractured clavicle) opined that Myles was probably not standing when he was injured, explaining that "[i]t almost sounds like the guy was sitting or down and was hit; you know his upper body was struck ... he could have been sort of grazed, sort of brushed, or jumped away or fell off and landed on his shoulder ... I would expect rib fracture and maybe more of an internal chest injury [if a tire had run over his body]." Our emphasis.
Responding to cross-examination, the orthopedist "supposed" that it was possible that Myles could have been sitting and was struck by a car as it went past him.

DISCUSSION
A comparison of what this record shows and does not show facilitates our analysis. Myles, a dark-complected man, was drunk, perhaps staggering while walking somewhere on or near the street, and apparently was seen sometimes laying, sitting or sleeping on or near the paved roadway before Ms. Turner's telephone call. Myles intended to walk to the home of another girlfriend in the neighborhood when he left the first girlfriend. Even after being injured he attempted to sit up, stand up, and walk from the scene but was stopped by the investigating officer.
Where Myles was, what he was doing, and in what position, for how long at any given time after he walked past the church as Ms. Turner was driving the one and one-half blocks northerly from her home on Georgia street, we simply do not know.
We also do not know the width of the street or the shoulders thereof, the depth of the grass on the shoulder, the depth and width or the incline of the adjacent ditches, if any. We do not know the incline of the street or other visibility factors or distance. We do not know whether the trial court concluded that ditches were adjacent to the street. We know the street had potholes and was poorly lighted but we do not know other prevailing conditions in the block of Georgia street where Myles may have been injured.
Myles alleged he was walking north but testified he was walking south on the right hand side of the street. He was obviously found not credible, because in that position he would have been erect in the opposing lane in which Ms. Turner was driving. From the nature of Myles's injuries, the orthopedist concluded Myles was not standing when he was injured. Even when Myles was walking, as he said he remembered, past the church, we do not know where on the street or the shoulder he was.
*389 Myles's credibility and his burden of proving Ms. Turner negligent are further compounded by his acknowledgments that he did not know or remember what happened, when, how or where, in relation to the street, he was injured, or who injured him by what means.
We know what Ms. Turner told the investigating officer and what her testimony was about why she said she did not see him, and about her speed and observation and how she and Officer Crump generally described the area and prevailing conditions on that Sunday morning.
We know that Ms. Turner testified why she "thought, felt, sensed or determined" that she had just run over a man laying in the middle of the street, as she reported in her telephone call. Even assuming the best on this record for Mylesthat he was somehow "bumped" by Ms. Turner's vehicle, or vice versa, and was first seen by her in a given position in her rearview mirror after she stoppeddoes not allow the conclusions or deductions of where and in what position or motion Myles was before she first saw him or why she should or should not have seen him before that time. We cannot even assume how, where and under what circumstances Myles became unshirted before he was seen by Ms. Turner. Assumptions cannot aid Myles's burden of proof in his action against Ms. Turner.
We cannot assume what sort of vehicle the assumed motorist-telephoner was driving or propelling in what direction when he saw Myles. We do know, in a general and somewhat vague way, where Myles was reported to be in relation to the paved street from what each of the first two callers reported. We cannot assume, however, Myles was in this or that position after the callers made their respective report.
We can neither assume that Myles was slowly walking or standing or sitting uninjured on the paved street as Ms. Turner approached him, as he premises his argument, nor that he was in any other position or motion somewhere in relation to the pavement or shoulder of the street.
Weighing and assessing the totality of the evidence, including Ms. Turner's apposing recorded report to the 911 number and her testimony why she thought or determined she had run over someone, the trial court concluded that Myles had not proved that Ms. Turner's vehicle struck him and that if a vehicle did strike him, it was because he could not be seen.
We might "suppose," as did the orthopedist when responding to cross-examination, that it "was possible" that Myles "could have been" in almost any position anywhere when he was injured, even squarely in the northbound lane of Georgia street as Myles's counsel suggests. The orthopedist's initial hypothesis, based solely on the location and nature of Myles's injuries, however, was "the guy was sitting or down and was hit ... could have been sort of grazed, sort of brushed ..." Even the initial possibility of the orthopedist [could have been] does not rise to the level of preponderancy of the evidence.
Even should we assume, however, that Ms. Turner's vehicle or wheel did brush or graze Myles, or vice versa, the answer to whether or not she should have seen him in time to avoid injuring him, depends on where he was in what position and motion when she was a given distance away from him.
For instance, speculate that Myles was entirely somewhere on the paved street, uninjured, but still and prone, and raised himself to a sitting position, attempting to walk when Ms. Turner's vehicle was any given distance away, fifteen or five feet. Or speculate that Myles, in an interval of semi-sober and conscious agility attempted to crawl toward the paved roadway from a prone position on the grassy shoulder or the slope of the ditch, responding to the noise and lights of an approaching vehicle at some given distance from him.
At best for Myles, this record supports only the speculation or possibility that some vehicle could have "grazed" or "brushed" Myles, or vice versa, even perhaps Ms. Turner's vehicle. That possibility does not, however, meet Myles's's burden of proving that Ms. Turner could have or should have seen Myles when she had the time and *390 distance to avoid him or warn him of her approach, the critical elements of negligence in a vehicle-pedestrian or -incapacitated person case. LRS 32:214 and cases cited supra.
On this record we cannot say the trial court was clearly wrong in accepting Ms. Turner's testimony about her speed and observation and her explanation why she did not see Myles as she approached where she later saw him and why she thought or determined that she had run over a man laying in the middle of the street.

BURDEN OF PROOF
Negligence cannot be assumed or proved by what "could have" happened, by speculation or by possibilities. Negligence may be proved either by direct or by circumstantial evidence, but one who relies on circumstantial evidence meets his burden of proof only when the whole of the evidence shows that the defendant's fault was the most plausible cause of the injury and that no other factor as reasonable can be ascribed as the cause. Blanchard v. Sotile, 394 So.2d 633 (La.App. 1st Cir.1980), writ denied.
Myles's burden was to show that the most plausible cause of Myles's injuries (fractured clavicle, abrasions to his head and on his left shoulder) was Ms. Turner's breach of her duty to see him in time to take proper precautionary measures to avoid him. See LRS 32:214 quoted in part supra.
Every case of this type presents these questions: Where was the pedestrian or incapacitated person, in what position or posture, and at what distance from the vehicle when the motorist allegedly could have or should have, seen him and become obligated to exercise either "due care to avoid" him as a pedestrian or "proper precaution upon observing him" as an incapacitated person? Baumgartner and Finley, cited supra, answered these questions. In Nero, cited supra, the motorist's vehicle fatally struck the decedent in the street, but it was emphasized that that record did not show how that decedent made his way into the path of that vehicle. The questions raised here were not answered either by the record in Nero or by the record in this case.
A driver is not strictly liable in all auto-pedestrian cases. Absolute liability is not imposed on a motorist simply because a vehicle collides with a person. The injured person must yet meet his burden of proving negligence on the part of the motorist. Nero, supra. This burden remains whether the motorist's negligence is labeled contributory or comparative. C.C. Art. 2323.

DECREE
At appellant's cost, the judgment is AFFIRMED.
NORRIS, J., dissents with written reasons.
WILLIAMS, J., dissented for reasons assigned by NORRIS, J.
NORRIS, Judge, dissenting.
I respectfully dissent. This case hinges on two questions: did Ms. Turner hit Myles, and should she have seen him lying in the road ahead? This record clearly answers "yes" to both.
On the first question, the trial court dwelt solely on Myles's poor ability to recall how the accident occurred. Apart from this, however, the overwhelming weight of the evidence is that Ms. Turner did in fact strike Myles. Here are her exact words to the 911 dispatcher: "I just ran over somebody, a man who was lying in the middle of the street * * * and I saw blood all on the side of his face" (emphasis added). In her pro se answer, Ms. Turner again admitted that Myles was lying in the street and that she called 911 to report hitting him. R.pp. 4-5. This is, in effect, a judicial admission of the fact. La.C.C. art. 1853. At no time during trial did she deny she struck him.
Neither of the other 911 callers, who phoned just moments before Ms. Turner, reported hitting Myles or seeing him injured in any manner. One even got out of his car and tried to wake Myles up. Only Ms. Turner saw blood "all over" his face, and this after feeling a "bump" in the road and seeing Myles a short distance behind her car. In fact, she gave Officer Crump an exact description of Myles's location in the road right after the impact. In light of all this evidence, *391 the trial court's finding that "there has been no showing that defendant even struck plaintiff in the first place" is plainly wrong; its further finding ("not sure if he was hit on Georgia Street, the Union Pacific Railroad * * * or by an airplane landing at the Monroe Airport") merely posits improbables and is clearly, obviously wrong.
On the second question, Ms. Turner testified that she did not see Myles because "he didn't have on a shirt and he was lying in the road and there was poor lighting." Even if this were true, she is not absolved of fault if the evidence shows that she could have seen Myles by exercising due diligence. La.R.S. 32:214; Jackson v. Cook, 189 La. 860, 181 So. 195 (1938); Finley v. North Assur. Co. of Amer., 476 So.2d 837 (La.App. 2d Cir.1985).
Two unidentified persons, who were obviously able to see Myles, called 911 at 5:31 and 5:32 a.m. Both (at least one of them was a motorist himself) reported seeing a black male lying in the street where the accident soon occurred. Less than five minutes later, Ms. Turner ran over the same man in the street and thereafter told Officer Crump Myles's exact location and position. Myles's treating physician, Dr. Brown, corroborated from his injuries that Myles must have been sitting or lying somehow in the street when the accident occurred.
Ms. Turner testified that she was driving slowly, some 10 to 15 m.p.h., with her headlights on low beam as it was still dark outside. With no evidence that they were defective, her headlights should have enabled her to see 150 feet ahead. La.R.S. 32:321(2). She was looking for potholes in the road and should have seen a man lying or sitting there, and at her speed, avoided striking him. She did not say that her view was in any way obstructed. She felt her right tire hit a bump, stopped the car, and checked her rear view mirror to see what she had struck. At this time, she was suddenly able to see Myles, illuminated only by her own taillights and struggling to sit up behind her car. Although it was still dark, Officer Crump had no apparent difficulty seeing Myles in the street upon his arrival. This, together with the corroborating evidence of the other 911 callers, distinguishes the case from Aetna Casualty & Sur. Co. v. Nero, 425 So.2d 730 (La.1983), relied on by the majority.
Nero was decided under the old régime of contributory negligence and all-or-nothing recovery. See Baumgartner v. State Farm, 356 So.2d 400 (La.1978). However, we are no longer shackled by the legal fiction of Baumgartner. See Finley, 476 So.2d at 845. As the majority points out, each case should rest on its own facts. This case, in my view, is a quintessential example of the application of comparative negligence. Ms. Turner failed to see what she should have seen under the circumstances; Myles acted in gross disregard for his own safety. I would therefore reverse this plainly wrong judgment, allocate fault 25% to Ms. Turner and 75% to Myles, and render judgment accordingly.